STATE OF NORTH CAROLINA EX REL UTILITIES COMMISSION v.
THE NORTH CAROLINA MOTOR CARRIERS ASSOCIATION AND
THE CITY OF WILMINGTON, NORTH CAROLINA.

(Filed 30 November, 1960.)

**1. Constitutional Law §§ 6, 7:    Utilities Commission § 1—**

Questions of policy in regard to rates for public utilities and carriers
fall within the province of the legislative body, some of which it has
delegated to the Utilities Commission. Whether the Legislature has
given the Utilities Commission authority to initiate on its own motion
an investigation of the entire rate structure of carriers, and place the
burden upon the carriers to show that the old rate structure, which
had been in effect for a number of years with the approval of the Com-
mission, were just and reasonable, *quaere?* G.S. 62-72, G.S. 62-121.29,
G.S. 62-26.

**2. Utilities Commission § 5—**

On appeal by the affected carriers from an order of the Utilities
Commission putting into effect a schedule of rates, it is the province
of the courts to review the administrative decision to see that the
rights of the parties involved are protected.

**3. Carriers § 5:    Utilities Commission § 3—**

Mileage alone is not a sufficient basis for the determination of in-
trastate rates by the Utilities Commission, but the Commission must
consider all factors involved in rate making, including competition
from interstate carriers, the different modes of transportation, the to-
pography and volume of business as affecting costs, etc.

**4. Same—**

An order of the Utilities Commission striking out a rate structure
which had been in existence for a number of years and substituting
therefor a rate structure based solely on mileage, with a sole excep-
tion to meet barge competition between two specified termini, is proper-
ly reversed on appeal for failure of the Commission to take into con-
sideration other relevant factors in rate making, but, there being some
evidence before the Commission of inequities in the rates theretofore list-
ed in the tariffs, the cause should not be dismissed, but should be re-
manded for further hearing and disposition with respect to rates found
to be unjust, unreasonable or unlawfully discriminatory.

APPEAL by North Carolina Utilities Commission from *Mintz, J.,*
May 1960 Term, NEW HANOVER Superior Court.

This proceeding was initiated on February 28, 1957, by the North
Carolina Utilities Commission, upon its own motion, to conduct an
investigation "with respect to the policies, practices, rates and charg-
es now in effect on and in connection with movements of petroleum
and petroleum products, in tank trucks, by motor vehicle common
and contract carriers from and to points and places in North Caro-

lina." The North Carolina railroads, the City of Wilmington, the North Carolina Oil Jobbers Association, and Esso Standard Oil Company intervened.

The Commission began its hearing on October 15, 1957. The proceeding was designated Docket No. T825, Sub 13 — the purpose of which is "to determine whether the rates and charges (of the respondents listed in Appendix B) . . . or any of such rates . . . are unjust and unreasonable, prejudicial, preferential, or in violation of the law." The Commission announced: " . . . The burden of proof rests upon them (respondent motor carriers) in this proceeding to show that the said rates and charges for the transportation of petroleum products are just and reasonable, and upon failure to . . . show that said rates and charges are just and reasonable, the Commission will fix and order into effect the minimum or maximum, or minimum and maximum rates and charges it deems to be just and reasonable."

The Commission called and examined as its only witness Mr. Noah, its staff expert, who identified and offered exhibits showing rates in effect at the time of the investigation. These studies and charts showed terminals in North Carolina where motor tank trucks, both common and contract carriers and railway tank cars, are loaded with petroleum products, the various points of delivery throughout the State, and the rates and charges fixed by the carriers in their tariffs on file with the Commission. These tariffs had been in effect with the Commission's approval from 1942, with certain changes made in 1952. Perhaps of significance in the present condition of the record, is the fact that many of these tariffs are "paper," that is, practically no actual transportation of petroleum products is involved. The witness pointed out that the tariffs in effect in various instances show charges in some instances more for shorter than for longer hauls, the same for different length hauls, and different amounts for the same length hauls. After explaining the charts, Mr. Noah testified: "I do not have any information as to which of the destinations or termination points that I refer to in my Exhibit No. 1 have bulk storage facilities. I do not have any information available now as to what volume of the traffic I referred to moves on scale rates rather than on point-to-point rates, or what percentage of traffic that constitutes. Let me point out again that these exhibits show only an analysis of rates as published in the tariffs. We have not undertaken to develop by any investigation volume of tonnage or any other operational question."

" . . . There have been a few instances in the past where our Department has discussed violations of that statute (long and short

hauls, G.S. 62-128) in so far as motor carriers are concerned with either Mr. Outlaw or Mr. Forest in the office of the North Carolina Motor Carrier's Association. I do not recall those commodities or points at the moment. With respect to those instances, it is true that the Association or the tariff agent corrected the tariff to conform with the long haul statute."

The Motor Carriers Association introduced evidence to the effect that the basis for the rates now in effect was established in 1942 or 1943, with adjustments in 1952. The carriers seek permission to stay on the present rates, but if changes were to be made, the committee proposed a scale of rates which would produce the same revenue and would correct any inequities pointed out by Mr. Noah. "Our committee would be glad to change any inequities in the tariff at any time. In fact, in times past it has been called to our attention that there were inequities and for that matter typographical errors that we have changed immediately when they were called to our attention. As I turn through the five graphs (as filed by Mr. Noah) there are various places from each terminal where there are one or two very high rates. The ones that I have seen so far there is no movement to them that I have heard of in recent years." Such are what the trade calls "paper rates." " . . . our committee would change any rate of those high points that was not reasonable. There are many points in North Carolina which are low because they were first put in by the rails to meet some interstate rate or some water-borne rate. There is one rate in particular . . . that is very low because of the competition that the rails themselves had . . . from Wilmington to Fayetteville . . . by barge up the Cape Fear. . . . In order to keep any of that traffic the trucks put in the same rate that the rails had put in. . . . That . . . is regarded throughout the industry as an excessively depressed rate based on competition alone."

Esso Standard Oil Company, one of the interveners, contended the change from the existing rate to a strictly mileage rate would react to the material detriment and nullify its recent expenditure of $1,341,000 in expanding its terminal facilities at Wilmington. Change in the rate structure as proposed by the Commission "would be detrimental to carriers operating primarily from Wilmington (port terminal) or Thrift (pipeline terminal near Charlotte)" as future movements would be made from Charleston, port terminal, and Camp Croft, pipeline terminal, in South Carolina; and in the same manner movement from Norfolk, Virginia, would take away traffic from Morehead City, North Carolina.

Tariffs from these points in South Carolina and Virginia to points in North Carolina are governed by interstate rates which are lower than those based on the mileage rule proposed by the Commission. The carriers and the State of North Carolina have gone to great expense to develop port facilities at Wilmington and Morehead City. The carriers, both motor and rail, have developed terminal facilities for the handling of petroleum products in great quantities and have geared their operations accordingly. Great loss will result unless carriers' tariffs are such as will permit them to meet competition from outside the State.

Mr. Downing, who has had 39 years experience in traffic and transportation, and presently Director of Wilmington Bureau of Rates and Industry, stated to the Commissioner that to enable Wilmington to maintain its competitive position, "A prerequisite is a . . . rate structure flexible enough to enable the carriers serving Wilmington to meet competition at other ports and inland points." In 1956, 2,898,528 tons of petroleum products moved into Wilmington by ocean tankers. The competition is partially from origins located outside the State. The statement cites distances and rates from Charleston, South Carolina, to cities in North Carolina. For example, the rate per 100 pounds from Charleston to Asheville is 37.4¢. The rate in North Carolina for the same distance is 38.6¢. All State carriers serving Wilmington will require wide latitude; otherwise the traffic now moving from Wilmington will be diverted to points outside the State.

Numerous witnesses for the respondents and the interveners testified in substance that petroleum products move in intrastate commerce from ocean terminals at Morehead City, Wilmington, and by barge to Fayetteville; and from pipeline terminals at Thrift, Salisbury and Friendship. These products also move into North Carolina in interstate commerce from ocean terminals at Charleston, South Carolina, and Norfolk, Virginia, and from pipeline terminals at Camp Croft, South Carolina, and from two points in East Tennessee. Light petroleum products seldom move more than 150 miles over North Carolina roads or railroads. The witness expressed the opinion that a straight uniform mileage tariff rate would cause the transfer of such movement from Wilmington and Morehead City to Charleston and Norfolk, and from pipeline terminals in North Carolina to terminals in South Carolina and Tennessee.

A witness for Esso Standard Oil Company testified:

"I. That the Esso Standard Oil Company has been operating

under the rates published in North Carolina Motor Carriers Association, Inc., Tariff N C U C No. 50, and we find them to be both just and reasonable without prejudice to either consignee, consignor or carrier. That we have not received any complaint from either customer or carrier regarding rates as published.

"II. That any change in the rate structure detrimental to Wilmington, North Carolina, as a shipping point would nullify our additional of $1,341,000 spent during the period January 1, 1955, through September 30, 1957. This money was expended to increase traffic through the Port of Wilmington by use of super tankers and will discourage a further expenditure of monies in this behalf. This will deprive the City of Wilmington of revenue normally received from sale of provisions, equipment, supplies, etc., to these vessels.

"III. That any change in the rate structure would be detrimental to carriers operating primarily from Wilmington or Thrift, North Carolina, as product now being delivered from these shipping points would be diverted to Charleston or Camp Croft, South Carolina, depriving North Carolina intrastate carriers of revenue that they are now enjoying."

At the conclusion of the hearing, the Commission made the following findings:

"1. That respondents have failed to sustain the burden of proving that present rates and charges for the transportation of Petroleum and Petroleum Products, in tank trucks are just and reasonable, except that present rate of 11.1 cents applicable from Wilmington to Fayetteville and River Terminal to meet barge competition has been justified as a reasonable minimum competitive rate;

"2. That rates and charges for the transportation of Petroleum and Petroleum Products, in tank trucks, as described in Items 30 and 40 of North Carolina Motor Carriers Association, Inc., Agent, Tariff No. 5-I, NCUC No. 50, by motor-vehicle common carriers participating therein are unjust and unreasonable and result in undue preference or advantage to and undue discrimination against persons and places, in violation of G.S. 62-121.28(3);

"3. That rates and charges for the transportation of Petroleum and Petroleum Products, in tank trucks, by motor-vehicle contract carriers having schedules of minimum rates and charg-

es on file with the Commission as listed in Appendix A hereto are unreasonable in violation of G.S. 62-121.30;

"4. That in the interest of both the public and the carriers rates and charges on Petroleum and Petroleum Products in tank trucks should be uniform, thus giving each shipping and receiving point a nonpreferential or nonprejudicial rate;

"5. That except from Wilmington to Fayetteville and River Terminal rates and charges as minima set forth in Appendix B hereto are just and reasonable minimum rates and charges for the transportation of Petroleum and Petroleum Products, in tank trucks, by both motor-vehicle common and contract carriers; and

"6. That motor-vehicle common and contract carrier rates should be made on distance constructed over highways authorized by the State Highway Commission for traffic of the weight of Petroleum and Petroleum Products in tank trucks."

Upon the basis of these findings, the Commission ordered into effect uniform rates per 100 pounds based entirely on mileage. The rates for rail transportation in tank car lots are precisely the same as for tank trucks. The order provided, however, that distances shall be computed on the basis of highway rather than rail mileage. The order makes this one exception: "Not applicable to movements from Wilmington to Fayetteville and River Terminal."

The respondents and interveners filed exceptions to the findings of fact upon the ground they are not supported by any competent or material evidence, and without that support the rate change was not justified. The Commission overruled these exceptions and ordered the rates into effect.

After exhausting all administrative remedies, the respondents and interveners appealed to the Superior Court of New Hanover County. Upon the record duly certified by the Commission, Judge Mintz heard the appeal and, after hearing, entered judgment in part as follows:

"1. The final order of the Commission found the rates under investigation to be unlawfully discriminatory because in many instances the motor carriers were charging less for longer hauls than for shorter hauls and the same amount for different length hauls and different amounts for the same length hauls. This finding is only supported by testimony of the Commission's witness showing disparities between rates when related solely to distance. The finding is, therefore, unsupported by competent material

and substantial evidence in view of the entire record as submitted. * * *

"3. That said Commission's order is not supported by any substantial material and competent evidence that the public has been injured or that present rates of the motor carriers create any unlawful monopoly or constitutes unjust and unreasonable rates.

"4. That said order is not supported by any material evidence upon which the Commission could take into consideration other proper factors for fixing rates among others but not limited to investment of jobbers, shippers and carriers, based upon existing rate structure, variations in terrain in different areas of the state, competitive advantages and disadvantages with out-of-state terminals, and competition of private carriers.

"5. That the substantial rights of the appellants and interveners have been prejudiced because the Commission's findings, inferences, conclusions and decision are made upon unlawful proceedings, and unsupported by competent material and substantive evidence, in view of the entire record as submitted, are arbitrary and capricious, and are affected by other errors of law as set out in the Notices of Appeal and Assignments of Error of the Appellants and Interveners."

From the judgment of the Superior Court, the Commission appealed.

*Thomas Wade Bruton, Attorney General, F. Kent Burns, Assistant Attorney General for the North Carolina Utilities Commission, appellant.*

*James B. Swails, Cicero P. Yow for the City of Wilmington, North Carolina, appellee.*

*Allen & Hipp, by Edward B. Hipp for North Carolina Motor Carriers Association, appellee.*

HIGGINS, J. The Commission ordered the inquiry entirely, on its own motion, without any complaint that rates in effect were unfair, unjust, discriminatory, or should be changed. The respondents and interveners, therefore, argue the Commission was without authority to wipe out the rates and tariffs filed by the carriers, approved by the Commission, and accepted by the shippers and all customers after all parties for years had geared their operations, made their investments, relying on those rates. Apparently Judge Mintz was impressed by the logic of the argument.

Whether, under the circumstances here disclosed, it was wise to strike down an old and established rate structure and to supplant it with one entirely new and founded on so narrow a base as mileage, is probably a question of policy rather than one of law. Policy decisions are for the Legislature, some of which are left to the Commission. The Legislature, by G.S. 62-72, G.S. 62-121.29, has given the Commission authority to inquire into intrastate rates for the transportation by common carriers of petroleum products by truck or rail, or both. The Commission initiated this inquiry into a rate structure which had been in effect with Commission approval for years without objection either from the public, any carrier, shipper, or customer. The long acquiescence of the Commission in the existing tariff rate offered at least some assurance of stability to this type of transportation business. However, purporting to act under G.S. 62-26, the Commission pointed its finger at all truck and rail carriers and said, You must here and now justify these rates or we shall reverse our former holding that they are just and reasonable and shall hold they are unjust and unreasonable and supplant them with new rates. Whether the Legislature intended to give such plenary authority over the whole rate structure may be open to question. The Act says when any rate, schedule, practice, act, etc., is under investigation, the burden of proof shall be on the carrier or public utility whose rate, etc., is under investigation to show that the same is just and reasonable. The statute uses the word "carrier" or "utility" in the singular. See *Utilities Commission v. Carolina Power & Light Co.,* 250 N.C. 421, 109 S.E. 2d 253; *Scull v. R. R.,* 144 N.C. 180, 56 S.E. 876. Here, the Commission makes the rule applicable to all carriers and all rates. The Commission is the complainant, the prosecutor and the judge. The policy of courts, under such circumstances, is to review administrative decisions to see that rights are protected. *Russ v. Board of Education,* 232 N.C. 128, 59 S.E. 2d 589. The question here discussed is raised by the record — a direct answer is not now required. The main controversy may be resolved on other grounds.

Two critical questions arise on the record. First, does the evidence aided by any proper presumption show the rates in effect at the time the investigation started to be unjust, unreasonable, and discriminatory? Second, does the evidence show the proposed rates to be just, reasonable, and lawful?

The evidence of the Commission's rate expert as depicted by his charts, shows the rates on file in certain instances are lower for long-

er haul than for a shorter haul; the same for different length hauls; and different for the same length hauls. The tariffs cover hauls from all terminals. However, the evidence shows that a large percentage of the points and rates listed are paper rates. In view of this fact, Mr. Noah's admission severely dilutes, if it does not destroy, probative value of his charts. He said: "Let me point out again that these exhibits show only an analysis of rates as published in the tariffs. We have not undertaken to develop by any investigation volume of tonnage or any other operational question." The Commission contends the mere fact that tariffs show different rates for different distances is in itself a showing of discrimination, and cites as authority, *Hines v. R. R.*, 95 N.C. 434; *Lumber Co. v. R. R.*, 141 N.C. 171, 53 S.E. 823. In these cases the plaintiff sued to recover for freight overcharges on the ground the carrier charged other shippers a lesser rate for similar services. In the *Lumber Co.* case the Court said: "So dependent are all commercial activities upon adequate service by the great companies which conduct these public employments, that the general situation demands the stern code that all who apply shall be served with adequate facilities for reasonable compensation, and without discrimination." These cases interpret shippers' rights to equal rates with others under existing statutes. The fundamentals of ratemaking were not involved.

It appears even from Mr. Noah's evidence that rate-making involves more than mileage. The Commission's order itself makes an exception and states the order is not applicable to movements from Wilmington to Fayetteville and River Terminal. This exception leaves the old rate in effect. There are factors involved in rate-making which justify lower per-mile rates from some points than from others. The evidence indicates that business of some carriers and from some distribution points will be taken away unless a competitive rate lower than the Commission's schedule is permitted. The law does not contemplate that all rates shall be equal for like distances. Room is left for a rate structure which takes all factors of rate-making into account. G.S. 62-121.28 makes unlawful a rate that creates an *unjust* discrimination or *undue* or *unreasonable* advantage. Many factors give Wilmington, for example, *advantages* over Thrift. These arise from location, accessibility to sea lanes, volume of business and cost of movement. For example, the cost of operation over steep and crooked mountain roads where snow and ice are not infrequent handicaps is more than in the coastal area. Wilmington, therefore, has a natural advantage over Thrift. Recognizing these advantages by provision for a lower per-mile rate is not unjust discrimination.

Failure to recognize them may be unjust discrimination. Notwithstanding the Commission's declaration to the contrary in its order denying the rehearing, the effect of the Commission's order is to make new rates. Mileage alone is not a sufficient base for rates. 13 C.J.S., Carriers, § 291, p. 668; *Texas & Pacific Railway Co. v. United States,* 289 U.S. 627.

Notwithstanding the Commission's order that the investigation shall embrace "charges for the transportation of petroleum and petroleum products . . . by common and contract carriers," actually the evidence and new rates ordered into effect apply only to common and not to contract carriers. The reasons for this limitation are set forth by *Justice Parker* in *Utilities Commission v. Towing Corp.,* 251 N.C. 105, 110 S.E. 2d 886.

The evidence before the Commission was sufficient to show some inequities in rates listed in the tariffs. It was insufficient to support an order that the entire rate structure was unjust and unreasonable. For the same reasons, the evidence was insufficient to show the schedule of rates ordered into effect by the Commission, based entirely on mileage, are just and reasonable.

The judgment of the Superior Court to the extent it reversed the order of the Utilities Commission, is affirmed. So much thereof as directs the Commission to dismiss the proceeding, is reversed. The Superior Court will remand the proceeding to the Utilities Commission for such further hearing and disposition as may be appropriate with respect to the rates of any common carrier of the products here contemplated as may be found to be unjust, unreasonable, or unlawfully discriminatory.

Affirmed in part and reversed in part.