STATE OF NORTH CAROLINA, ex rel UTILITIES COMMISSION, KENAN TRANSPORT COMPANY, and NORTH CAROLINA MOTOR CARRIERS ASSOCIATION, INC., AGENT FOR MOTOR COMMON CARRIERS v. BIRD OIL COMPANY, BURKE OIL COMPANY, LAMPLIGHTER OIL COMPANY, WEIL OIL COMPANY, and NORWOOD OIL COMPANY

No. 50

(Filed 6 January 1981)

1. Administrative law § 8— appeal from administrative agency — scope of judicial review — burden on parties and reviewing court

In presenting appeals to the judicial branch from the State administrative agencies, it is essential that the parties present their contentions as to the appli-

Utilities Comm. v. Oil Co.

cable scope of judicial review. Likewise, the reviewing court should make clear the review standard under which it proceeds.

**2. Administrative Law § 8; Utilities Commission § 51— requirements for reversal of order of Utilities Commission**

Judicial reversal of an order of the Utilities Commission is a serious matter for the reviewing court which can be properly addressed only by strict application of the six criteria of G.S. 62-94 which circumscribe judicial review.

**3. Carriers § 5.1; Utilities Commission § 51— common carrier rates — petroleum products — criterion for review of Utilities Commission order**

The criterion for review of an order of the Utilities Commission relating to the dedicated service provision in the tariff schedule for motor vehicle common carriers of petroleum products was whether the order is affected by errors of law within the meaning of G.S. 62-94(d)(4) where the issues presented for review by appellants were based on the contentions that the Utilities Commission committed "errors of law" in reaching its decision, the holding of the Court of Appeals that the dedicated rate scheme is discriminatory and preferential implicitly indicated a determination that the Utilities Commission committed an error of law, and appellants essentially argue in the Supreme Court that the Commission's order was proper as a matter of law and that the Court of Appeals erred as a matter of law in vacating such order.

**4. Carriers § 5; Utilities Commission § 43— differential in public utility rates**

The question of law with respect to public utility rate differentials is not whether the differential is merely discriminatory or preferential but is whether the differential is an *unreasonable* or *unjust* discrimination. G.S. 62-140.

**5. Carriers § 5; Utilities Commission § 43— differential in public utility rates**

There must be substantial differences in service or conditions to justify a differential in public utility rates.

**6. Carriers § 5; Utilities Commission § 43— substantial differences in services or conditions — factors considered**

Factors which constitute "substantial differences in service or conditions" and, therefore, justify a rate differential include (1) quantity of use, (2) time of use, (3) manner of service, and (4) costs of rendering the two services.

**7. Carriers § 5.1— common carrier rates — petroleum products — dedicated service provision — no discriminatory and preferential rates**

The Court of Appeals erroneously held as a matter of law that the dedicated service provision in the tariff schedule for motor vehicle common carriers of petroleum products, which provides for a lower rate for petroleum products when the common carrier assigns a single unit of equipment to the exclusive and continuous use in intrastate commerce of one shipper for a minimum of 100 hours per week for 20 consecutive weeks, is discriminatory and preferential in violation of G.S. 62-140 where there was substantial evidence that (1) the cost per shipment for carriers on dedicated traffic was 15.5% lower than cost per shipment on nondedicated traffic; (2) the manner of service is different in that fewer tractor-

trailers and drivers are required to serve dedicated traffic than nondedicated traffic; (3) the quantity of use for dedicated traffic is greater than for nondedicated traffic in light of the 100 hour per week minimum usage requirement; (4) the time of use of dedicated traffic is different in that practically full-time loading and unloading facilities must be available to carriers under the dedicated rate while nondedicated rate users normally make available such facilities only during the normal 40 to 50 hour work week; and (5) a driver of dedicated equipment becomes more familiar with loading and unloading requirements of a customer and this familiarity is beneficial from the standpoint of safety, thus reducing the frequency and costs of accidents.

8. **Carriers § 5.1— common carrier rates — petroleum products — dedicated service provision — no conversion by common carrier into contract carrier**

A common carrier of petroleum products which commits a part of its equipment to dedicated use should not be regarded as a matter of law as a contract carrier since common carriers participating in the dedicated rate arrangement are also rendering service to the public generally and are providing service impartially to all persons requesting such service.

Justice BROCK did not participate in the consideration or decision of this case.

ON appeal as a matter of right pursuant to G.S. 7A-30(2) from the decision of the Court of Appeals, 47 N.C. App. 1, 266 S.E. 2d 838 (1980), one judge dissenting, vacating the order of the Utilities Commission dated 11 April 1979 which approved Supplement No. 8 to Petroleum Tariff No. 5-0, N.C.U.C. No. 110, containing revisions in Item 8005-A (Dedicated Service), applying to petroleum and petroleum products, issued by the North Carolina Motor Carriers Association, Inc., Agent, and filed with the Commission on 5 January 1978.

The issue on this appeal is whether the Court of Appeals properly vacated the order of the Utilities Commission allowing a revision in the "dedicated service" provision of the Petroleum Tariff to permit the commingling of hours generated in interstate and intrastate commerce in determining the minimum of one hundred hours per week required for the dedicated service rate. We find the proceedings before and the order of the Utilities Commission proper and reverse the Court of Appeals.

*Allen, Steed and Allen, P.A., by Thomas W. Steed, Jr., and Joseph W. Eason, for plaintiff-appellants Kenan Transport Company and North Carolina Motor Carriers Association, Inc., Agent.*

*Hatch, Little, Bunn, Jones, Few & Berry, by David H. Permar, for protestant-appellees.*

Utilities Comm. v. Oil Co.

CARLTON, Justice.

On 17 April 1963 the North Carolina Motor Carriers Association, Inc., agent for carriers of petroleum products participating in the Motor Freight Tariff, filed with the North Carolina Utilities Commission a supplement to the then-existing tariff. The supplement established "Dedicated Service" rates which essentially provided for a fifteen percent lower rate for intrastate shipments of gasoline, kerosene, jet fuel, diesel fuel oil No. 1, and fuel oils Nos. 1, 2 and 3, provided that the common carrier assign a single unit of the carrier's equipment to the exclusive and continuous use in intrastate commerce of one shipper for a minimum of one hundred hours per week for twenty consecutive weeks. Pursuant to statutes applicable at that time the Utilities Commission conducted the usual investigation and hearing and issued its order in Docket No. T-825, Sub 68 on 27 September 1963 finding the dedicated service rates just and reasonable and ordering them into effect. 53 N.C. Utilities Comm. Reports 524 (1963). Dedicated service rates have remained in the petroleum tariff of the North Carolina Motor Carriers Association, Inc. [hereinafter "NCMCA"], as amended and re-issued from time to time, since September 1963.

On 5 January 1978 NCMCA, as agent for motor common carriers, filed a proposed amendment to the existing dedicated service rates, Item 8005-A of Supplement 8 to Petroleum Tariff No. 5-0, N.C.U.C. No. 110. The proposed amendment allowed hours generated by the dedicated unit of equipment used in *interstate* commerce, in addition to hours in *intrastate* commerce, to be counted in determining whether the minimum of one hundred hours per week required by the dedicated service rule had been met. This type provision is commonly referred to as a "commingling clause."

On 23 January 1978 the Utilities Commission issued an order of suspension, investigation and notice of hearing, suspending Item 8005-A, Dedicated Service, Paragraph (f) for a period of 270 days and setting the matter for hearing on 10 May 1978.

On 8 February 1978 the Utilities Commission Public Staff filed its Notice of Intervention.

Appellees, fuel oil jobbers, filed a verified protest to Item 8005-A on 17 April 1978 and moved, pursuant to G.S. 62-136, to

expand the scope of the hearing to include an investigation of the *existing* dedicated service rates.

On 2 May 1978 Kenan Transport Company, on behalf of itself and other motor vehicle common carriers participating in the proposed revision in the dedicated service rules, filed a response in opposition to the protest and a motion to expand and continue the hearing.

The Utilities Commission issued an order on 4 May 1978 allowing the protestants to intervene as protestants in opposition to the proposed revision in the dedicated service rules, expanding the scope of the hearing pursuant to G.S. 62-136 to include an investigation of the existing dedicated service rates, ordering the motor common carriers participating in the tariff to file additional information, and continuing the hearing to 2 August 1978.

A hearing was held before the hearing examiner on 2 August 1978. Both Kenan and protestants presented evidence. On 5 January 1979 the hearing examiner issued a recommended order approving the commingling amendment, cancelling the prior order of suspension and investigation and dismissing the proceeding.

On 22 January 1979 the protestants filed their exceptions to the recommended order. Following a hearing on the exceptions, the Utilities Commission issued its final order on 11 April 1979, overruling and denying protestants' exceptions and adopting and affirming the recommended order.

Protestants appealed to the Court of Appeals. That court vacated the order of the Utilities Commission, holding, *inter alia*, that "the *entire* dedicated rate provision is discriminatory and preferential in violation of G.S. 62-140 and other applicable portions of the General Statutes pertaining to Motor Carriers." 47 N.C. App. at 9, 266 S.E. 2d at 843 (emphasis added). Judge Vaughn dissented, noting that the existing rate structure is presumed to be just and reasonable and that the protestants have the burden of proving otherwise. In his opinion, the findings of the Commission were conclusive because they were supported by substantial evidence in view of the entire record.

NCMCA and Kenan appealed to this Court as a matter of right by virtue of Judge Vaughn's dissent. For reasons stated below, we reverse the Court of Appeals and direct that the order of the Utili-

ties Commission be reinstated.

Other facts pertinent to our decision are noted below.

## II.

[1]    Before addressing the merits, we note that none of the parties
to this cause suggested in brief the applicable scope of judicial
review on this appeal. Moreover, the Court of Appeals' opinion
presents no review standard other than the generalization that its
task was to "ascertain whether the orders . . . conform to the man-
date of the General Assembly." This is a serious omission. In pre-
senting appeals to the judicial branch from state administrative
agencies, it is essential that the parties present their contentions as
to the applicable scope of judicial review. Likewise, the reviewing
court should make clear the review standard under which it pro-
ceeds. The proliferation of appeals from state administrative agen-
cies during recent years requires an orderly appellate process.
Such order is totally lacking when one body must guess the scope of
review provided by another and when the parties fail to structure
their arguments on appeal according to the relevant standard.

We therefore turn to a determination of the appropriate scope
of judicial review of the order of the Utilities Commission. While
most appeals in this State from the actions of administrative agen-
cies to the judicial branch are governed by our Adminstrative
Procedure Act, G.S. Chapter 150A, the Utilities Commission is
specifically exempted from the coverage of that chapter. G.S. §
150A-1(a) (1978). When judicial review of administrative actions is
provided in the statute under which the administrative action is
taken, the right of appeal to the courts is to be first determined by
looking at the statute. 2 Am. Jur. 2d *Administrative Law* § 559
(1962). We therefore turn to the public utilities chapter of our
General Statutes, Chapter 62, to determine the appropriate scope of
judicial review of an order of the Utilities Commission. G.S. 62-94 is
controlling. That section provides, *inter alia*, that the reviewing
court may (1) affirm, (2) reverse, (3) declare null and void, (4)
modify, or (5) remand for further proceedings, decisions of the
Commission. The Court's power to affirm or remand is not specifi-
cally circumscribed by the statute. However, the power of the court
to reverse or modify and, *a fortiori*, to declare null and void, is
substantially circumscribed to situations in which the court must

find (a) that appellant's substantial rights, (b) have been preju-
diced, (c) by Commission findings, inferences, conclusions or deci-
sions which are

   (1) in violation of constitutional provisions; or

   (2) in excess of statutory authority or jurisdiction of the
       Commission, or

   (3) made upon unlawful proceedings, or

   (4) affected by other errors of law, or

   (5) unsupported by competent, material and substantial
       evidence in view of the entire record as submitted, or

   (6) arbitrary or capricious.

G.S. § 62-94(b) (1975); *see Daye*, North Carolina's New Adminstra-
tive Procedure Act: An Interpretive Analysis, 53 N.C.L. Rev. 833,
911-12 (1975). Other provisions of the statute provide that "due
account shall be taken of the rule of prejudicial error," G.S. §
62-94(c) (1975), and that orders of the Commission "shall be prima
facie just and reasonable," G.S. § 62-94(e) (1975).

**[2]**   Read contextually, therefore, the requirements that *"substan-
tial rights* have been *prejudiced,"* that error must be prejudicial and
that actions of the Commission are presumed just clearly indicate
that judicial reversal of an order of the Utilities Commission is a
serious matter for the reviewing court which can be properly ad-
dressed only by strict application of the six criteria which circum-
scribe judicial review.[1]

**[3]**   In light of the foregoing, it becomes necessary for this Court to
determine under which criterion for review the Court of Appeals
should have addressed this proceeding. Only then can we decide

---

[1] For a similar analysis of the judicial review section of the North Carolina
Adminstrative Procedure Act, G.S. Chapter 150A, *see Daye, supra*, 53 N.C. L. Rev.
at 911-12. We acknowledge that the legislative intent that court reversal of adminis-
trative agency action be substantially circumscribed is more clearly stated in G.S.
150A-51 than in G.S. 62-94. In spite of the slight variation in wording of the two
statutes, however, we think the intent of our Legislature in providing for judicial
review of orders of the Utilities Commission and other state agencies covered by the
Administrative Procedure Act to be essentially the same. We also stress again the
importance of uniformity in judicial review of administrative decisions. *See Com-
missioner of Insurance v. Rate Bureau*, 300 N.C. 381, 395, 269 S.E. 2d 547, 559 (1980).

whether the Court of Appeals' decision was proper.

The controlling review statute, G.S. 62-94, also provides that an "appellant shall not be permitted to rely upon any grounds for relief on appeal which were not set forth specifically in his notice of appeal filed with the Commission." G.S. § 62-94(c). Protestant-appellants in the Court of Appeals, appellees here, were apparently aware of this provision, for in their Exceptions and Notice of Appeal four of the six criteria noted above were referred to in attacking various findings and conclusions of the Commission, *e.g.*, that the Commission's order was in excess of statutory authority, made upon unlawful proceedings, affected by other errors of law and unsupported by competent, material and substantial evidence in view of the entire record. While taking this broadside approach in giving notice of appeal, however, protestants did not bring forward and argue these specific statutory grounds for reversal of the Commission's order in their brief to the Court of Appeals.

The proper scope of review can be determined only from an examination of the issues presented for review by the appealing party. The nature of the contended error dictates the applicable scope of review. In their appeal to the Court of Appeals, protestants presented three issues for review, the gists of which were: (1) whether the lower rate charged users of dedicated service is unlawfully discriminatory and preferential; (2) whether offering of dedicated rate service by a common carrier unlawfully converts a common carrier into a contract carrier; and (3) whether the Recommended Order and Final Order of the Commission are erroneous as a matter of law because they do not contain the findings and conclusions required by law. From these issues it is apparent that the basis for all the proffered issues is protestants' contention that the Commission committed "errors of law" in reaching its decision. Additionally, although the Court of Appeals' opinion does not disclose the standard under which that court considered the issues, its holding that the dedicated rate scheme is discriminatory and preferential implicitly indicates a determination that the Commission committed an error of law and the opinion is written accordingly. Moreover, appellants essentially argue to this Court that the Commission's order was proper as a matter of law and that the Court of Appeals erred as a matter of law in vacating the Commission's order.

From all these factors, plus our review of the record, we think

it obvious that G.S. 62-94(b) (4), whether the order is affected by errors of law, governs our review. Having determined the specific statutory scope of our review, we turn to the merits of the controversy and apply the record and contentions to the stated criterion for review.

## III.

In their protest filed with the Commission on 17 April 1978, protestants alleged essentially that the dedicated service rate constitutes "an unreasonable preference or advantage in violation of N.C.G.S. 62-140 and the publication of said dedicated service rates is in violation of the proscription contained in N.C.G.S. 62-140 . . . ." The Court of Appeals held that "the entire dedicated rate provision is discriminatory and preferential in violation of G.S. 62-140 . . . ." The primary question before us, therefore, is whether upon a review of the entire record the dedicated rate scheme violates the provisions of G.S. 62-140. That statute provides in pertinent part as follows:

> (a) No public utility shall, as to rates or services, make or grant any *unreasonable preference or advantage* to any person or subject any person *to any unreasonable prejudice or disadvantage*. No public utility shall establish or maintain any *unreasonable difference as to rates or services* either as between localities or as between classes of service.

G.S. § 62-140 (Cum. Supp. 1979) (emphases added).

[4] This statute has led to establishing in this jurisdiction the laudable rule of law that there must be no *unreasonable* discrimination by public utilities between those receiving the same kind and degree of service. *See State ex. rel. Utilities Comm. v. Mead Corp.,* 238 N.C. 451, 78 S.E. 2d 290 (1953). In establishing rates, the statute plainly prohibits (1) *unreasonable* preferences, (2) *unreasonable* advantages, (3) *unreasonable* prejudices, (4) *unreasonable* disadvantages and (5) *unreasonable* differences. G.S. § 62-140. Neither the statute nor the case law, however, prohibits *any* preferences, advantages, prejudices, disadvantages, differences or discrimination in setting rates. The long-established question of law with respect to rate differentials is not whether the differential is merely discriminatory or preferential; the question is whether the differential is an *unreasonable* or *unjust* discrimination. *Id.* This inter-

pretation is not inconsistent with the "[a]dditional declaration of policy for motor carriers" provided in G.S. 62-259[2] and quoted in the Court of Appeals' opinion. The emphasis of that statute is on "unfair" and "undue" preferences, advantages and competitive practices.

This Court has previously interpreted the meaning of "unreasonable," as used in G.S. 62-140, in *State ex rel. Utilities Comm. v. Teer Co.*, 266 N.C. 366, 146 S.E. 2d 511 (1966). In *Teer* the Court upheld a Commission order which concluded that a rate differential on two rail lines of approximately equal distance with the same destination was not unreasonable. The reason for the rate differential was the difference in number and cost of the switching movements required for each line. Justice Lake, writing for the Court, concluded that "a substantial difference between the costs of rendering the two services justifies some difference in the rates, nothing else appearing." *Id.* at 376, 146 S.E. 2d at 518. The *Teer* Court reiterated its approval of statements made by courts in other jurisdictions that, "[t]he charging of different rates for service rendered under varying conditions and circumstances is not unlawful," *Brown v. Pennsylvania Public Utility Comm.*, 152 Pa. Super. 58, 61, 31 A. 2d 435, 437 (1943), and that "[a]ny matter which presents a substantial difference as a ground for distinction between customers, such as quantity used, time of use, or manner of service, is a material . . . factor," *Ford v. Rio Grande Valley Gas Co.*, 141 Tex. 525, 527, 174 S.W. 2d 479, 480 (1943).

---

[2] That statute provides:

> In addition to the declaration of policy set forth in G.S. 62-2 of Article 1 of Chapter 62, it is declared the policy of the State of North Carolina to preserve and continue all motor carrier transportation services now afforded this State; and to provide fair and impartial regulations of motor carriers in the use of the public highways in such a manner as to promote, in the interest of the public, the inherent advantages of highway transportation; to promote and preserve adequate economical and efficient service to all the communities of the State by motor carriers; to encourage and promote harmony among all carriers and *to prevent discrimination, undue preferences or advantages, or unfair or destructive competitive practices between all carriers;* to foster a coordinated statewide motor carrier service; and to conform with the national transportation policy and the federal motor carriers acts insofar as the same may be practical and adequate for application to intrastate commerce.

G.S. § 62-259 (1975) (emphasis added).

Likewise, Justice Higgins, writing for the Court in *State ex rel. Utilities Comm. v. North Carolina Motor Carriers Ass'n*, stated:

> [R]ate-making involves more than mileage .... There are factors involved in rate-making which justify lower per-mile rates from some points than from others .... The law does not contemplate that all rates shall be equal for like distances. Room is left for a rate structure which takes all factors of rate-making into account. [The statute] makes unlawful a rate that creates an *unjust* discrimination or *undue* or *unreasonable* advantage.

253 N.C. 432, 440, 117 S.E.2d 271, 276 (1960) (emphases in original).

[5] From the foregoing and other sources has emerged the principal of law in this jurisdiction that "[t]here must be substantial differences in service or conditions to justify difference in rates." *State ex rel. Utilities Comm. v. Mead Corp.*, 238 N.C. at 462, 78 S.E. 2d at 298; *accord, State ex rel. Utilities Comm. v. Municipal Corps.*, 243 N.C. 193, 203, 90 S.E. 2d 519, 527 (1955).

[6] From the authorities noted above we are able to list several factors previously approved by this Court which constitute "substantial differences in service or conditions" and, therefore, justify a rate differential: (1) quantity of use, (2) time of use, (3) manner of service, and (4) costs of rendering the two services.

[7] Applying the foregoing to the record before us, we find substantial and competent evidence of each of the factors listed above to support a finding of "substantial differences in service or conditions" of transportation services rendered to shippers under the dedicated rate vis-à-vis the services rendered shippers under the general rate. There was substantial evidence that: (1) the cost per shipment for carriers on dedicated traffic was 15.5% lower than cost per shipment on non-dedicated traffic, (2) the manner of service is different in that fewer tractor-trailers and drivers are required to serve dedicated traffic than nondedicated traffic, (3) the quantity of use for dedicated traffic is obviously greater than for nondedicated traffic in light of the 100 hour per week minimum usage requirement, and (4) the time of use of dedicated traffic is different in that practically full-time loading and unloading facilities must be available to carriers under the dedicated rate while nondedicated rate users normally make available such facilities

only during the normal 40 to 50 hour work week.

The record also discloses a "substantial difference in . . . conditions." Testimony established that a driver of dedicated equipment became more familiar with loading and unloading requirements of a customer and this familiarity is beneficial from the standpoint of *safety*, thus reducing the frequency and costs of accidents.

We do not attempt here to itemize every difference between dedicated and nondedicated service. It is unnecessary for us to reach the argument presented with respect to whether competition is a factor which would justify a rate differential. The evidence is more than abundant to justify the finding of a "substantial difference in services and conditions" from the factors discussed above.

Protestants place heavy reliance on two decisions of this Court: *Lumber Company v. Railroad*, 136 N.C. 479, 53 S.E. 823 (1904), and *State ex rel. Utilities Comm. v. Railway*, 256 N.C. 359, 124 S.E. 2d 510 (1962). This reliance is misplaced. Not only are these cases clearly distinguishable from that before us, neither endorses any rule contrary to that reaffirmed here. Both of these cases stand for the proposition that unlawful discrimination exists only when a rate differential or other preference is applied to those operating under substantially similar circumstances and conditions. Such is not the situation disclosed by the record before us.

The burden of proving that the dedicated service rate is discriminatory and preferential lies here with protestants, the complaining parties. G.S. § 62-75 (1975); *accord, State ex rel. Utilities Comm. v. Edmisten*, 291 N.C. 424, 230 S.E. 2d 647 (1976). We are also governed by the statutory provisions that: (1) rates established by the Commission shall be deemed just and reasonable, G.S. § 62-132 (1975); (2) the rates or other actions of the Commission shall, on appeal, be "*prima facie* just and reasonable," G.S. § 62-94(e); and (3) this Court, on appeal, must give due account to the rule of prejudicial error, G.S. § 62-94(c).

Applying the appropriate criterion for judicial review here as discussed in Section II of our opinion, we find that no "substantial rights" of protestants "have been prejudiced," that no prejudicial error was committed in the proceedings before the Commission, and that the Court of Appeals erroneously held as a matter of law that the dedicated rate provision is discriminatory and preferential in violation of G.S. 62-140 and other statutes. We hold that there

were no errors of law in the proceedings before the Commission and its order as contemplated by G.S. 62-94(b) (4).

## IV.

**[8]** Appellees next contend that use of the dedicated rate structure circumvents statutory restrictions by allowing a common carrier to convert itself, in effect, into a contract carrier and then charge a lower rate than common carriers charge.

In presenting this argument, protestants point to the testimony of the Kenan witness who explained the dedicated rate operation. According to his testimony, once a petroleum transport is assigned to dedicated service, it becomes unavailable for use by other shippers during its twenty or more weeks of operation under the dedicated rate plan. For example, if a dedicated service transport is returning empty after making a delivery, it cannot be used for another shipper; neither can it be used for another shipper if sitting idly. This raises the possibility that a dedicated carrier would have to refuse service to a shipper at a time it may actually have equipment available. Protestants argue that this, for all practical purposes, converts a common carrier to a contract carrier.

The crucial question therefore is whether a common carrier which commits a part of its equipment to dedicated use should be regarded as a matter of law as a contract carrier. Our statutes and case law impel a negative answer.

G.S. 62-3(7) defines a common carrier as one "which holds itself out to the general public" to engage in transportation services. G.S. 62-3(8) refers to a contract carrier as one "which, under an individual contract or agreement" engages in transportation services "other than the transportation referred to in subdivision (7) of this section."

From these statutes, it is clear that the crucial test to determine whether one is a common carrier is whether he holds himself out as such. This Court so held in *Jackson v. Stancil*, 253 N.C. 291, 116 S.E. 2d 817 (1960) where it was said, "The crucial test as to 'whether one is a common carrier is whether he holds himself out as such, either expressly or by a course of conduct, that he will carry for hire on a uniform tariff all persons applying . . . so long as he has room.'" *Id.* at 302, 116 S.E. 2d at 825 (citations omitted); *accord*, *Cantlay & Tangola, Inc. v. Senner*, 92 Ariz. 63, 373 P. 2d 370 (1962).

It is true, as protestants argue, that any service rendered by a common carrier to a shipper under the dedicated rate arrangement is the result of a contract between the carrier and the shipper. There is absolutely nothing in the record before us, however, to indicate that such contracts preclude a common carrier from rendering service to the public generally or interfere with the carrier's holding itself out to serve the public. To the contrary, the record discloses that the common carriers participating in the dedicated rate arrangement are holding themselves out to and do indeed provide transportation services to other petroleum shippers. Additionally, while contract carriers must establish a minimum rate, they are not required to charge all shippers the same rate. Explanation of the North Carolina Truck Act of 1947, N.C. Utilities Comm. General Order No. 4066-A, 8 (June 1, 1948). Common carriers, on the other hand, must charge a uniform tariff for their services. While the dedicated rate is less than the regular rate and results in lower charges for larger shippers, the dedicated rate is equally available, and on the same terms, to all. We find nothing inconsistent between the dedicated rate structure and the duty of common carriers to hold themselves out to the general public and provide service impartially to all persons requesting service. We hold that the Commission did not commit an error of law as contemplated by G.S. 62-94(b)(4) in adhering to the same view.

V.

We note finally that we are not insensitive to the plight of protestants. The resulting inequity to protestants from the dedicated rate structure is, however, as Judge Vaughn correctly notes in his dissent, that the major oil companies in some cases base the freight or shipping allowance given to the oil jobber on the dedicated rate rather than the regular tariff. Any loss suffered by the oil jobbers due to their inability to use the dedicated service results from the petroleum pricing arrangement between them and the major oil companies and not from any unlawful rate structure approved by the Utilities Commission.

For the reasons stated above, the decision of the Court of Appeals is reversed and this cause is remanded to that court with directions to reinstate the order of the Utilities Commission, dated 11 April 1979, in Docket No. T-825, Sub 226, establishing paragraphs (a) through (f) of Item 8005-A in Local Motor Freight Tariff No. 5-0.

Reversed and remanded.

Justice BROCK did not participate in the consideration or decision of this case.