STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION AND GUIGN-ARD FREIGHT LINES, INC., APPELLEES v. TAR HEEL INDUSTRIES, INC., COMPLAINANT-APPELLANT AND RUFUS L. EDMISTEN, ATTORNEY GENERAL, INTERVENOR

No. 8410UC1360

(Filed 1 October 1985)

Carriers § 5.1— common carrier—contract tariff improperly approved

　　　The Utilities Commission erred by approving a common carrier's proposed tariff for the shipment of textiles corresponding to a contract with Dupont where it was clear that the parties envisioned a long-range contractual relationship and the tariff filed with the Commission did not mention the carrier's willingness to dedicate equipment and personnel to the exclusive use of other individual shippers as it did with Dupont, and there was no evidence indicating that the carrier was willing to lease special equipment to serve individualized needs of other shippers or to train its employees to operate unique equipment

belonging to other shippers and to make managerial decisions regarding the time and contents of the shipments, as it did with Dupont. The individually negotiated terms of the Dupont contract were not compatible with public service as a common carrier. G.S. 62-3(7), (8), G.S. 62-262(a).

APPEAL by complainant, Tar Heel Industries, Inc., from order of the North Carolina Utilities Commission entered 18 September 1984. Heard in the Court of Appeals 22 August 1985.

On 10 February 1984 Guignard Freight Lines, Inc. (Guignard), a common carrier as defined by N.C. Gen. Stat. 62-3(6), filed with the Utilities Commission a new local freight tariff pursuant to N.C. Gen. Stat. 62-134. The tariff established rates below those previously filed with the Commission for the shipment of textiles between Cape Fear, Maco and Wilmington, North Carolina. The new rates corresponded to the terms of a service contract awarded Guignard by E. I. Dupont de Nemours & Co., Inc. (Dupont), under which Guignard is to transport textiles produced at Dupont's Cape Fear manufacturing plant to nearby Maco and Wilmington warehouses. Previously Tar Heel Industries, Inc. (Tar Heel), a contract carrier by motor vehicle as defined by N.C. Gen. Stat. 62-3(8), had serviced the Dupont shuttle operation.

On 24 February 1984 Tar Heel filed with the Commission a complaint alleging that the Dupont shuttle operation constitutes contract carriage which Guignard, a common carrier, lacks authority to perform, and that the rates proposed in the tariff are below the cost of service and therefore constitute unreasonable preferences to a single shipper and "a destructive competitive practice as contemplated by G.S. 62-259." On 18 September 1984 the Commission approved Guignard's proposed tariff and denied Tar Heel's complaint.

Tar Heel appeals.

*Bailey, Dixon, Wooten, McDonald, Fountain & Walker, by J. Ruffin Bailey, Ralph McDonald, and Carolin Bakewell, for Tar Heel Industries, Inc., complainant appellant.*

*Temple & Grimes, by G. Henry Temple, Jr., for Guignard Freight Lines, Inc., respondent appellee.*

State ex rel. Utilities Comm. v. Tar Heel Industries, Inc.

WHICHARD, Judge.

Review of a Utilities Commission decision is governed by N.C. Gen. Stat. 62-94. The decision is "prima facie just and reasonable." N.C. Gen. Stat. 62-94(e). The reviewing court may reverse or modify only if

> substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional provisions, or
>
> (2) In excess of statutory authority or jurisdiction of the Commission, or
>
> (3) Made upon unlawful proceedings, or
>
> (4) Affected by other errors of law, or
>
> (5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
>
> (6) Arbitrary or capricious.

N.C. Gen. Stat. 62-94(b); *see Utilities Comm. v. Oil Co.*, 302 N.C. 14, 19-20, 273 S.E. 2d 232, 235 (1981).

The facts here are not disputed. Whether under the undisputed facts Guignard is operating as a common carrier is a question of law for the court. *Jackson v. Stancil*, 253 N.C. 291, 301, 116 S.E. 2d 817, 824 (1960). Tar Heel contends that the individualized nature of the Dupont shuttle operation precludes performance by a common carrier, that the Commission erred as a matter of law in finding that Guignard's performance of the Dupont contract constitutes common carriage which Guignard is authorized to perform, and that Tar Heel's substantial rights have been prejudiced as a result. We agree and accordingly reverse on the ground that the order is affected by error of law. N.C. Gen. Stat. 62-94(b)(4).

With certain exceptions, *see* N.C. Gen. Stat. 62-260, -265, a person or entity wishing to engage in intrastate transportation of goods or passengers must receive authorization from the North Carolina Utilities Commission. N.C. Gen. Stat. 62-262. The Commission may authorize one of two types of operation: (1) it may

grant a certificate authorizing performance as a common carrier, i.e., "any person which holds itself out to the general public to engage in the transportation by motor vehicle in intrastate commerce of persons or property or any class or classes thereof for compensation, whether over regular or irregular routes, except as exempted in G.S. 62-260," N.C. Gen. Stat. 62-3(7); or (2) it may issue a permit authorizing performance as a contract carrier by motor vehicle, i.e.,

> any person which, under an individual contract or agreement with another person and with such additional persons as may be approved by the Utilities Commission, engages in the transportation other than the transportation referred to in subdivision (7) of this section, by motor vehicle of persons or property in intrastate commerce for compensation, except as exempted in G.S. 62-260.

N.C. Gen. Stat. 62-3(8). A common carrier must charge all customers uniform rates for the same kind and degree of services; contract carriers, by contrast, are not subject to this requirement. Oil Co., 302 N.C. at 22, 27, 273 S.E. 2d at 237, 239.

It is clear from the above definitions that a contract carrier is not authorized to act as a common carrier. It may not offer its services to the general public. Indeed, it may serve "at most a very limited number of shippers, and then only under a private individual contract with each shipper to be served." Explanation of the North Carolina Truck Act of 1947, N.C. Utilities Comm. General Order No. 4066-A at 7 (1 June 1948).

It is equally clear from these and other provisions of the Public Utilities Act that a common carrier generally is not authorized to act as a contract carrier. N.C. Gen. Stat. 62-262(a) specifies: "Except as otherwise provided . . . , no person shall engage in the transportation of passengers or property in intrastate commerce unless such person shall have applied to and obtained from the Commission a certificate or permit authorizing such operations . . . ." (Emphasis supplied.) A "certificate" authorizes performance as a common carrier, N.C. Gen. Stat. 62-3(2), while a "permit" authorizes performance as a contract carrier, N.C. Gen. Stat. 62-3(20).

The factors considered by the Commission in determining whether an applicant qualifies for a certificate of common carriage differ significantly from those considered in determining whether a contract carrier permit should be issued. An applicant for a certificate must demonstrate:

(1) That public convenience and necessity require the proposed service in addition to existing authorized transportation service, and

(2) That the applicant is fit, willing and able to properly perform the proposed service, and

(3) That the applicant is solvent and financially able to furnish adequate service on a continuing basis.

N.C. Gen. Stat. 62-262(e). In determining whether to grant a permit the Commission must consider:

(1) Whether the proposed operations conform with the definition . . . of a contract carrier,

(2) Whether the proposed operations will unreasonably impair the efficient public service of carriers operating under certificates, or rail carriers,

(3) Whether the proposed service will unreasonably impair the use of the highways by the general public,

(4) Whether the applicant is fit, willing and able to properly perform the service proposed as a contract carrier,

(5) Whether the proposed operations will be consistent with the public interest and the policy declared in [the Public Utilities Act], and

(6) Other matters tending to qualify or disqualify the applicants for a permit.

N.C. Gen. Stat. 62-262(i). In addition, N.C. Gen. Stat. 62-264 provides that "[u]nless the Commission, in its discretion, finds that the public interest so requires, no person . . . shall hold both a certificate as a common carrier and permit as a contract carrier."

Read together, these provisions manifest legislative intent to create two distinct types of transportation, each required to

operate within its own boundary. To determine otherwise would strip the provisions of effect.

The prohibition against a common carrier acting as a contract carrier was explicitly stated by the Commission in its "Explanation of the North Carolina Truck Act of 1947":

> [A common carrier] is not permitted to enter into private individual contracts or agreements with particular shippers with respect to *rates or services.* . . . If permitted to do that, the railroads would be serving particular shippers and special interests and not the general public. The Truck Act merely subjects [motor] carriers to the long established and well-known principles of law that apply to other common carriers. (Emphasis supplied.)

N.C. Utilities Comm. General Order No. 4066-A at 6 (1 June 1948).

On its face the rate tariff proposed by Guignard and approved by the Commission applies to the general public. It provides the following rates for the pick-up and delivery of textile products and equipment between Cape Fear, Maco and Wilmington, North Carolina:

ALL LOADS FROM 1 TO 259 ........................ $35.95
ALL LOADS IN EXCESS OF 259
      BUT LESS THAN 300 ......................... $33.00
ALL LOADS IN EXCESS OF 300 ..................... $30.00

The terms of the Dupont contract, however, extend far beyond rates and customary pick-up and delivery. They require that Guignard dedicate equipment and drivers twenty-four hours a day, 365 days a year. Guignard has agreed to lease customized trailers from Dupont so that the plant's automatic loading system may be used. In addition, with each load the drivers must decide which of the two products produced at the plant must be transported. This requires the drivers to be aware of the relative speed at which each production line is moving and the extent to which the plant's limited storage capacity for each product is being used. It is clear that the parties envision a long-term contractual relationship.

In *Oil Co.*, 302 N.C. 14, 273 S.E. 2d 232, our Supreme Court implicitly recognized that, except as provided in N.C. Gen. Stat.

62-264, a common carrier cannot legally operate as a contract carrier. There the Commission's approval of a dedicated service rate was challenged. The rate, filed by common carriers of petroleum products, provided lower charges to shippers who agreed to have a single unit of the carrier's equipment assigned exclusively to them for a minimum of one hundred hours per week for twenty consecutive weeks. The court first held that the reduction of rates for quantity shippers did not constitute an "unreasonable preference" in violation of N.C. Gen. Stat. 62-140. 302 N.C. at 24, 273 S.E. 2d at 238. It then questioned the effect of a common carrier's agreement to commit equipment to the exclusive use of a single shipper for a twenty-week period. The Court phrased the question as "whether a common carrier which commits a part of its equipment to dedicated use should be regarded as a matter of law as a contract carrier." 302 N.C. at 26, 273 S.E. 2d at 239. Relying on the definitions of common carrier and contract carrier, N.C. Gen. Stat. 62-3(7) and 62-3(8) respectively, the court stated that the "crucial test" in determining whether an entity is operating as a common carrier is whether it is holding itself out as such. *Id.* Noting that "the dedicated rate is equally available, and *on the same terms to all,*" the court rejected the protestants' contention that the dedication of equipment amounted to contract carriage. 302 N.C. at 27, 273 S.E. 2d at 239. (Emphasis supplied.)

By contrast, nothing in the record here supports a finding that Guignard is holding itself out as willing to provide to the public the services it seeks to perform for Dupont. The tariff Guignard filed with the Commission does not mention its willingness to dedicate equipment and personnel to the exclusive use of other individual shippers. There is no evidence indicating that it is willing to lease special equipment to serve the individualized needs of other shippers or to train its employees to operate unique equipment belonging to other shippers and to make managerial decisions regarding the time and contents of shipments. Unlike the dedicated rate tariff filed in *Oil Co.,* the individually negotiated terms of the Dupont contract are not compatible with public service as a common carrier.

We note further that in determining that Guignard's proposed rates are just and reasonable the Commission relied heavily on the 259 loads per week minimum which Dupont guarantees Guignard. In addition, the Commission's computations made no

allowances for public use of the tariff. That the Commission, in dealing with the question of profitability, looked only at transactions which might occur between Dupont and Guignard seems inconsistent with the concept of public ratemaking.

Prohibiting a common carrier from functioning as a contract carrier is well-grounded in transportation regulation theory. Regulation has created a protected market for common carriers. Entry into the transportation industry as a common carrier is limited. Those seeking a certificate must demonstrate a public need and an ability to meet it. *See* N.C. Gen. Stat. 62-262(e). Common carriers benefit from requirements that before issuing new certificates or permits the Commission must consider their effect on existing common carrier operations. *See* N.C. Gen. Stat. 62-262(e)(1), (i)(2).

Entry into the market as a contract carrier is purposely less restricted. *See* N.C. Gen. Stat. 62-262(i); *see also* W. Thoms, *Rollin' On . . . To a Free Market: Motor Carrier Regulation 1935-1980*, 13 Transp. L.J. 43, 52 (1983) (by analogy to federal regulation). The market of a contract carrier is, however, more limited than that of a common carrier. A contract carrier offers its services to a limited number of persons, not to the general public. *Id.* at 52-53; Explanation of the North Carolina Truck Act of 1947, *supra*, at 7.

Once authorized, a common carrier may achieve economies of scale which a contract carrier by definition generally cannot. To allow common carriers to compete with contract carriers for individual private contracts not only would potentially interfere with the common carrier's duty to serve the public, but could price contract carriers out of their only market as well. *See* J. Guandolo, *Transportation Law* 316-19 (3d ed. 1979).

Commentators have noted the advantages of a free market and recent movement toward deregulation. *See, e.g.,* M. Pustay, *Intrastate Motor Carrier Regulatory Reform in South Dakota,* 52 Transp. Pract. J. 93 (1984) (noting relaxation of regulation in Arizona, Florida, South Dakota and Wisconsin); W. Thoms, *supra*, at 75-85 (noting partial federal deregulation). Our legislature has chosen to regulate the trucking industry, however, and neither the Utilities Commission nor this Court is free to ignore its mandates.

For reasons stated above, the Commission's order is reversed. This disposition renders consideration of Tar Heel's other arguments unnecessary. We note that Guignard may, pursuant to N.C. Gen. Stat. 62-264, seek authorization for dual operations as a common carrier and a contract carrier, which the Commission may grant if it finds that such operations are in the public interest.

Reversed.

Judges WELLS and PHILLIPS concur.