JOHN C. BROOKS, COMMISSIONER OF LABOR OF NORTH CAROLINA, COM-PLAINANT v. McWHIRTER GRADING COMPANY, INC., RESPONDENT

No. 119

(Filed 17 August 1981)

1. Administrative Law § 8; Master and Servant § 114— scope of review of decision of Safety and Health Review Board

    In an appeal from a decision of the N.C. Safety and Health Review Board assessing a penalty against respondent for a "serious" and "repeated" OSHA violation, respondent's contention that the violation was neither "serious" nor "repeated" and that the penalty should be stricken raised on appeal issues as to (1) whether the Board properly interpreted the terms "serious" and "repeated," i.e., whether the Board's interpretation is affected by error of law, G.S. 150A-51(4), and (2) whether there is substantial evidence in view of the entire record as submitted to support the Board's conclusion that the violation was "serious" and "repeated," G.S. 150A-51(5).

2. Master and Servant § 114— serious OSHA violation

    In order to establish a serious OSHA violation under G.S. 95-138, the Commissioner of Labor must show by substantial evidence that the violation created a possibility of an accident a substantially probable result of which was death or serious physical injury.

3. Master and Servant § 114— serious OSHA violation—insufficient evidence

    The Safety and Health Review Board erred in concluding that respondent committed a "serious" violation of an OSHA standard where there was no evidence that the failure to shore or slope the sides of a trench, which was dug in soil of ninety-five to ninety-seven percent compaction, created the possibility of an accident.

4. Master and Servant § 114— repeated OSHA violations—violations of different subsections of same standard

    Where two alleged OSHA violations were of different subsections of the same standard and involved the same hazard, the second violation could form the basis of a citation for a "repeated" violation.

**5. Master and Servant § 114— meaning of "repeated" OSHA violation**

A subsequent OSHA violation by the same employer substantially similar to a prior violation or violations is a "repeated" violation only if the employer should have known of the standard by virtue of the prior citation or citations. Factors which should be considered in determining whether the employer should have known of the standard are the extent to which the condition was obviously unsafe, the proximity in time to the prior citation, whether management or key employees had changed between citations, and the number of prior substantially similar violations. G.S. 95-138(a).

**6. Master and Servant § 114— "repeated" OSHA violation—insufficient evidence**

The Safety and Health Review Board erred in concluding that respondent committed a "repeated" OSHA violation in 1977 by failing to shore or slope the sides of a sewer line trench where a prior 1974 violation was based on the inadequacy of speed shoring used by respondent to support a trench dug in unstable soil adjacent to a highway; the 1977 violation was based on the absence of sloping or shoring of a trench dug in hard, compact soil; the second violation took place approximately two and one-half years after the first; the persons in charge of the work at the two jobsites were not the same; and there was ample evidence that the trench dug in hard and stable soil in 1977 was not "obviously unsafe."

ON writ of certiorari to the Court of Appeals to review the decision of that court, reported at 49 N.C. App. 352, 271 S.E. 2d 568 (1980), affirming judgment entered by *Hobgood (Hamilton H.), Judge,* on 12 October 1979 in Superior Court, WAKE County. The judgment of the superior court affirmed the decision of the North Carolina Safety and Health Review Board assessing against respondent a fine of $2,500 for a "serious" and "repeated" trenching violation.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General George W. Lennon, for the Commissioner of Labor.*

*Ervin, Kornfield & MacNeill, by John C. MacNeill, Jr., and Winfred R. Ervin, Jr., for appellant-respondent.*

CARLTON, Justice.

I.

The facts leading to this controversy are as follows: On 21 April 1977 James W. Stephens, a safety officer with the Occupational Safety and Health Division of the North Carolina Department of Labor [hereinafter "OSHANC"], made an inspection visit to respondent's work site at a shopping center on Tyvola Road in Charlotte. At the time of Mr. Stephens' visit respondent's

foreman, Mr. Leatherman, and two other employees were working on a storm sewer trench. The entire trench was about forty-five feet long, but only ten to twelve feet of the trench remained open. The trench had been dug in ten- to twelve-foot segments. After a segment was dug with a backhoe, steps which took up about four feet were placed in the trench and an employee entered the trench to grade it. The eight-foot sections of pipe were laid by a machine and were then covered. The trench was about eight feet deep, and the sides had neither been shored nor sloped, a violation of 29 CFR § 1926.652(c),[1] which provides that trenches dug in hard or compact soil more than eight feet long and five feet deep must be adequately shored or sloped.

Respondent's employees had dug about 1,000 feet of storm sewer trenching at the Tyvola Road jobsite and all trenches except the forty-five-foot section had been properly sloped. The engineering survey for the project stated that the soil at the jobsite was red clay earth at ninety-five to ninety-seven percent compaction. Mr. Leatherman, the foreman, himself decided not to slope the forty-five-foot trench because the ground was so hard. At the time of Mr. Stephens' visit respondent's employees had been working on the trench for about two hours, and no supervisory personnel had visited the site that day. The storm sewer pipe was thirty inches in diameter and was laid in the trench by a machine. Mr. Leatherman testified that only five or six feet of the trench was as much as eight feet deep and that a four-foot length of the trench was used for steps. Even though Mr. Stephens thought the violation was serious, he asked one of respondent's employees to get down into the trench to help him measure it.

Respondent's vice president, Michael Warr, is its chief estimator. As such, he goes over each site before work starts and advises the foremen or supervisors of the safety regulations that must be followed. With regard to the Tyvola Road site, he told Mr. Leatherman to slope or brace each trench over five feet deep. Neither he nor other management personnel had visited the jobsite on 21 April 1977 and none was aware of Mr. Leatherman's decision not to slope the sides of the forty-five-foot trench.

---

1. The federal occupational safety and health standards, Part 1926 of Title 29 of the Code of Federal Regulations, have been adopted in this state pursuant to G.S. 95-131 (1981).

On 18 November 1974 one of respondent's employees was killed when the trench in which he was working caved in. The accident occurred at a jobsite different from the one where the 1977 violation occurred. At the time of the 1974 violation respondent was constructing a sewer line about 29,000 feet long and 14½ feet deep. The trench was being dug in unstable soil and was adjacent to a highway. To support the sides of the trench respondent used speed-shoring, aluminum panels seven feet long held in place by hydraulic jacks placed one and one-half feet from the top and bottom of the trench. The cave-in occurred while respondent's employees were installing the next piece of speed shoring about four feet from the last piece. As a result of the accident respondent was cited for a "serious" violation of 29 CFR § 1926.652(b) for failure to shore, slope, sheet and brace properly the sides of a trench in unstable soil and for a violation of 29 CFR § 1926.652(e) for failure to use additional shoring when the trench is dug adjacent to a highway. Respondent did not contest the citation and paid the $500 fine.

Respondent has received no citations except for the 1977 and 1974 violations. After the 1974 fatality an OSHA inspector reviewed the trenching safety requirements with respondent's management personnel. Both the management personnel and the job foreman of the Tyvola Road site at which the 1977 violation occurred were aware of the OSHA requirements governing trenching at the time of Mr. Stephens' 1977 inspection visit.

Mr. Stephens determined that respondent had violated 29 CFR § 1926.652(c) (1980) which requires shoring or sloping the sides of a trench dug in compact soil and which is more than five feet deep and eight feet long. Mr. Stephens recommended that respondent be cited for a serious violation of 29 CFR § 1926.652(c) and that it be fined $500. On 28 April 1977, as a result of Mr. Stephens' visit and recommendation, respondent was issued a citation for a "serious" and "repeated" violation carrying a proposed penalty of $1,800.

On 18 May 1977 respondent filed its notice of contest with the North Carolina Department of Labor and on 20 May 1977 the Department of Labor filed the notice of contest with the North Carolina Safety and Health Review Board [hereinafter "Board"]. Pleadings were filed and the matter came on for hearing before Fred S. Hutchins, Jr., Hearing Examiner, on 18 August 1977. The

Brooks, Comr. of Labor v. Grading Co.

hearing examiner agreed with the Commissioner that respondent had violated 29 CFR § 1926.652(c) but concluded that the violation was neither "serious" nor "repeated" and, accordingly, struck the proposed $1,800 penalty in its entirety. Hearing Examiner Hutchins reasoned that the violation was not repeated because it was not of the same substandard of the OSHA regulations as the earlier violations and that it was not serious because respondent's foreman made the decision not to slope the sides of the trench on his own and without the knowledge or approval of the management and because in the event a cave-in occurred there was not a substantial probability that death or serious physical harm could result "because three men and a backhoe should be able to uncover a man very, very rapidly."

The Commissioner petitioned the Board on 26 September 1977 for review of the hearing examiner's decision.[2] After hearing evidence and considering the arguments of counsel the Board concluded that "the Hearing Examiner's order should be overturned, and the citation reinstated along with the penalty" for both a "serious" and a "repeated" violation and ordered that respondent be assessed a penalty of $2,500.

Pursuant to G.S. 95-141 respondent sought judicial review of the Board's decision before the Superior Court, Wake County. Arguments and briefs were considered by Judge Hobgood, who affirmed the Board's decision in its entirety on 12 October 1979. Respondent gave notice of appeal to the Court of Appeals.

The Court of Appeals, in an opinion written by Judge Wells, with Judges Arnold and Erwin concurring, held that (1) G.S. 95-135(i) does not require that the Board make new findings of fact and conclusions of law separate from those contained in the order of the hearing examiner, (2) the decision of the Board acceptably served to modify the order of the hearing examiner to conclude that the cited violation was "repeated" and "serious," justifying the additional penalty assessed, (3) there was sufficient evidence to support the Board's conclusion that the cited violation was "repeated" and "serious," (4) the acts and omissions of respondent's job superintendent were, on this occasion, imputable

2. Review of a hearing examiner's decision by the Board is provided for by G.S. 95-135(i) (1981).

to it, and (5) "[c]onsidering the whole record before the Superior Court . . . , the trial court was justified in affirming the decision of the Review Board . . . ."

After the applicable time period for petitioning this Court for discretionary review pursuant to G.S. 7A-31(a) had elapsed, respondent petitioned for a writ of certiorari. We granted the writ on 4 March 1981.

## II.

### A.

#### SCOPE OF JUDICIAL REVIEW

This Court is once again confronted with an appeal from a decision of a state administrative agency in which none of the parties suggests in brief the applicable scope of judicial review, nor does the Court of Appeals' opinion identify an appropriate standard. *See In re Appeal of North Carolina Savings & Loan League,* 302 N.C. 458, 276 S.E. 2d 404 (1981); *State ex rel. Utilities Commission v. Bird Oil Company,* 302 N.C. 14, 273 S.E. 2d 232 (1981). This continuing deficiency in the presentation for judicial review of the parties' contentions about the decision of an administrative agency is alarming and must be abated. We remind the lower courts, state administrative agencies and the profession of our comments in *Bird Oil:*

> This is a serious omission. In presenting appeals to the judicial branch from state administrative agencies, it is essential that the parties present their contentions as to the applicable scope of judicial review. Likewise, the reviewing court should make clear the review standard under which it proceeds. The proliferation of appeals from state administrative agencies during recent years requires an orderly appellate process. Such order is totally lacking when one body must guess the scope of review provided by another and when the parties fail to structure their arguments on appeal according to the relevant standard.

302 N.C. at 19, 273 S.E. 2d 232 at 235.

We therefore turn to a determination of the appropriate scope of judicial review of an order of the OSHANC Safety and Health Review Board. We discussed the guidelines for determin-

ing the appropriate scope of judicial review for appeals from state administrative agencies in *Commissioner of Insurance v. Rate Bureau,* 300 N.C. 381, 394, 269 S.E. 2d 547, 558 (1980). There, we noted that G.S. 150A-43, a part of the North Carolina Administrative Procedure Act (APA),[3] provides that a party aggrieved by a final agency decision is entitled to judicial review of the decision under the APA unless adequate procedure for review is provided by some other statute. Here, not only is there no other procedure for judicial review prescribed by some other statute, G.S. 95-141 expressly provides that judicial review from final decisions in contested cases made under OSHANC shall be in accordance with Chapter 150A of the General Statutes, the APA. *See also* G.S. § 95-135(i) (1981).

Clearly, therefore, this appeal is governed by the APA. We therefore turn to the APA to determine the proper standard for review. We reiterate our statement in *Appeal of North Carolina Savings & Loan League* that "[s]election of the proper standard is important in every appeal from an administrative decision because use of the correct standard clarifies the basic issues and focuses the reviewing court's inquiry on the relevant factors." 302 N.C. at 464, 276 S.E. 2d at 409. Also, as we said in *Bird Oil,* "it becomes necessary for this Court to determine under which criterion for review the Court of Appeals [and the superior court] should have addressed this proceeding. Only then can we decide whether the Court of Appeals' decision was proper." 302 N.C. at 20-21, 273 S.E. 2d at 236.

The guidelines for our determination were reviewed in our decision in *Appeal of North Carolina Savings & Loan League:*

Under the APA, a reviewing court's power to affirm the decision of the agency and to remand for further proceedings is not circumscribed. However, the court may reverse or modify only if

the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:

---

3. The APA is codified as Chapter 150A of the North Carolina General Statutes.

(1) In violation of constitutional provisions; or
(2) In excess of statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or
(6) Arbitrary or capricious.

G.S. § 150A-51 (1978).

302 N.C. at 463-464, 276 S.E. 2d at 408-409.

The appropriate standard, from those noted above, can be determined only after an examination of the issues presented by the appeal. "The proper scope of review can be determined only from an examination of the issues presented for review by the appealing party. The nature of the contended error dictates the applicable scope of review." *State ex rel. Utilities Commission v. Bird Oil Company,* 302 N.C. at 21, 273 S.E. 2d at 236.

[1] On this appeal, respondent contends that the 1977 trenching violation was neither "serious" nor "repeated" and that the fine imposed should be stricken. This contention raises two issues: whether the Board properly interpreted the terms "serious" and "repeated," *i.e.,* whether the Board's interpretation is affected by error of law, G.S. § 150A-51(4), and whether there is substantial evidence in view of the entire record as submitted to support the Board's conclusion that the 1977 violation was "serious" and "repeated." G.S. § 150A-51(5).

The propriety of the Board's action first turns on the meaning accorded the terms "serious" and "repeated." These are statutory terms, and any error made in interpreting them is an error of law. Hence, whether the substantial rights of respondents may have been prejudiced because the Board's decision is affected by an error of law is the first part of the scope of our inquiry on this appeal.

When the issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely

substitute its judgment for that of the agency and employ *de novo* review. Daye, *North Carolina's Administrative Procedure Act: An Interpretive Analysis,* 53 N.C.L. Rev. 833, 915 (1975); *see State ex rel. Commissioner of Insurance v. Rate Bureau,* 300 N.C. 381, 450, 269 S.E. 2d 547, 589 (1980); Director, Office of Workers' Compensation Programs, *U.S. Department of Labor v. O'Keefe,* 545 F. 2d 337 (3d. Cir. 1976). Although the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, those interpretations are not binding. "The weight of such [an interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Company,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124, 129 (1944).

*In re Appeal of North Carolina Savings & Loan League,* 302 N.C. at 465-66, 276 S.E. 2d at 410.

After applying the standard noted above and determining the correct interpretation of the statutory terms involved, we will determine whether the Board's findings and conclusions are "[u]nsupported by substantial evidence . . . in view of the entire record as submitted" as contemplated by G.S. 150A-51(5). In applying this standard of review, we keep in mind that:

[I]t is for the administrative agency to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. 73 C.J.S., *Public Administrative Bodies and Procedure, supra* at § 126. It is not our function to substitute our judgment for that of the Commissioner when the evidence is conflicting. However, . . . when evidence is conflicting, the standard for judicial review of administrative decisions in North Carolina is that of the "whole record" test. (Citations omitted.) As Justice Exum stated in *In re Rogers:* "The 'whole record' test is not a tool of judicial intrusion; instead, it merely gives a reviewing court the capability to determine whether an administrative

decision has a rational basis in the evidence. *See* Jaffe, Judicial Control of Administrative Action . . . 601 [(1965)]; Daye, *supra* at 920-921." 297 N.C. at 65, 253 S.E. 2d at 922.

*State ex rel. Commissioner of Insurance v. Rate Bureau,* 300 N.C. at 430, 269 S.E. 2d at 578.

This Court explained the "whole record" test in *Thompson v. Wake County Board of Education,* 292 N.C. 406, 410, 233 S.E. 2d 538, 541 (1977):

> This standard of judicial review is known as the "whole record" test and must be distinguished from both *de novo* review and the "any competent evidence" standard of review. *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 95 L.Ed. 456, 71 S.Ct. 456 (1951); *Underwood v. Board of Alcoholic Control,* 278 N.C. 623, 181 S.E. 2d 1 (1971); Hanft, *Some Aspects of Evidence in Adjudication by Administrative Agencies in North Carolina,* 49 N.C.L. Rev. 635, 668-74 (1971); Hanft, *Administrative Law,* 45 N.C.L. Rev. 816, 816-19 (1967). The "whole record" test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo,* Universal Camera Corp., *supra.* On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the Board's decision, to take into account whatever in the record fairly detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. Universal Camera Corp., *supra.*

Having determined the specific statutory scope of our review, we turn to the merits of this controversy and apply the stated criteria for review to the decision of the Board.

## B.

### SERIOUS VIOLATION

We next address the issue of whether the Court of Appeals erred in affirming the lower court's action in upholding the Board's determination that the violation was "serious." Whether

the violation was properly found to be "serious" is important in view of the penalty section of our Occupational Safety and Health Act. G.S. 95-138(a) (1981) provides that "[a]ny employer who has received a citation for a serious violation . . . *shall* be assessed by the Commissioner a civil penalty of up to one thousand dollars ($1,000) for each such violation."[4] (Emphasis added.)

In finding the violation to be "serious," the Board simply stated:

> We do not think that there is any doubt in anyone's mind how extremely hazardous trenching is in the construction industry. . . . This board can envision marginal situations in which shoring has been improperly installed or a trench has been improperly sloped. Under these circumstances, a violation might be termed non-serious; however, there are no mitigating factors present in this case.

As noted by the Court of Appeals, the Board's decision is "inexpertly written," containing "discussions, arguments, contentions, evidence and conclusions, all of which are intermixed and thrown together in somewhat random fashion." 49 N.C. App. at 356, 271 S.E. 2d at 571-72.

In the Court of Appeals, as here, respondent argued that the Board's finding that the violation was "serious" was not supported by substantial evidence. The Court of Appeals rejected respondent's argument with these simple statements: "The trench in question was eight feet deep and at least eight feet in length. There was no shoring or wall support of any kind, nor any sloping. Such evidence supports the Board's findings and conclusion that the violation was serious." *Id.* at 358, 271 S.E. 2d at 572. In our opinion, the Court of Appeals erred in dismissing respond-

---

4. We note that G.S. 95-138(a), the penalty section, also provides that "[i]f the violation is adjudged not to be of a serious nature, then the employer *may* be assessed a civil penalty of up to one thousand dollars ($1,000) for each such violation." (Emphasis added.) Although we are unaware of how the amount of the penalty for a nonserious violation is calculated, the record in the case before us indicates that when the violation is "serious," a presumptive fine of $1,000 is imposed. Adjustments of up to fifty percent are allowed for good faith, size and history in amounts of up to twenty, ten and twenty percent, respectively. The adjustments are deducted from the presumptive or "unadjusted" penalty to arrive at the proposed penalty. N.C. Department of Labor—Occupational Safety and Health Administration, Penalty Assessment Worksheet—Serious Violations.

ent's argument so summarily. By failing to identify and apply the appropriate scope of judicial review, as discussed above, that court failed to construe the statutory term "serious" and then apply a proper interpretation to the facts disclosed by the record to determine whether the Board properly imposed the additional penalty. "In reviewing an administrative agency's interpretation of a term, the appropriate inquiry is whether that interpretation is 'affected by . . . error of law,' G.S. 150A-51(4)." *In re North Carolina Inheritance Taxes,* 303 N.C. 102, 105, 277 S.E. 2d 403, 406 (1981).

Our task, therefore, is to ascertain the proper meaning of a "serious" violation. We will then review the Safety and Health Board's decision to determine if its conclusion that the cited violation was "serious" is supported by substantial evidence in view of the entire record, G.S. 150A-51(5).

G.S. 95-127(18) (1981) defines a "serious violation" as follows:

A "serious violation" shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations or processes which have been adopted or are in use at such place of employment, unless the employer did not know, and could not, with the exercise of reasonable diligence, know of the presence of the violation.

This definition of a "serious violation" is substantially similar to that set forth in Section 17(k) of the Occupational Safety and Health Act of 1970, codified as 29 U.S.C. § 666(j) (1975). The decisions construing the corresponding federal provision provide some guidance for interpreting this state's provision.

[2]  Our research reveals that the majority of courts considering the meaning of "serious violation" as used in the federal statute have concluded that that term embraces both (1) the *possibility* of an accident resulting from the conditions at the work site and (2) the *substantial probability* that death or serious physical harm could result if an accident did occur. *See Bunge Corp. v. Secretary of Labor,* 638 F. 2d 831, 834 (5th Cir. 1981); *Bethlehem Steel Corp. v. OSHRC,* 607 F. 2d 1069 (3d Cir. 1979); *Usery v. Hermitage Concrete Pipe Co.,* 584 F. 2d 127 (6th Cir. 1978); *Titanium Metals Corp. of America v. Usery,* 579 F. 2d 536 (9th

Cir. 1978); *Dorey Electric Co. v. OSHRC*, 553 F. 2d 357 (4th Cir. 1977); *California Stevedore & Ballast Co. v. OSHRC*, 517 F. 2d 986 (9th Cir. 1975). Although employers have argued that the substantial probability component of the statutory definition of serious violation applies also to the likelihood that an accident will occur, this contention has been rejected. The reasons for limiting the application of "substantial probability" to the likelihood of injury were best expressed by the Ninth Circuit Court of Appeals in *California Stevedore & Ballast Co.*:

> Congress declared its purpose "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ." OSHA § 2(b), 29 U.S.C. § 651(b). Congress clearly intended to require employers to eliminate all foreseeable and preventable hazards. *National Realty & Construction Co. v. OSHRC*, 160 U.S. App. D.C. 133, 489 F. 2d 1257, 1265-67 (1973). The original Senate bill treated all violations as "serious." As finally enacted, however, OSHA incorporated a House proposal to leave discretionary penalties for violations "determined not to be of a serious nature." Conf. Rep. No. 91-1765, 1970 U.S. Code Cong. & Admin. News, p. 5237. Congress apparently decided that violation of some regulations might pose so little threat of harm that a penalty should not be mandatory. Where violation of a regulation renders an accident resulting in death or serious injury possible, however, even if not probable, Congress could not have intended to encourage employers to guess at the probability of an accident in deciding whether to obey the regulation. When human life or limb is at stake, any violation of a regulation is "serious." We therefore adopt the Secretary's construction of section 17(k).

517 F. 2d at 988 (footnote omitted). We think this reasoning persuasive. The purpose of our General Assembly in enacting the Occupational Safety and Health Act, G.S. §§ 95-126 to 95-160 (1981), like that of Congress, was "to assure so far as possible every working man and woman . . . safe and healthful working conditions and to preserve our human resources." G.S. § 95-126(2). Thus, we hold that in order to establish a serious violation under G.S. 95-138 the Commissioner must show by substantial evidence, *see* G.S. § 150A-51(5), that the violation created a *possibility* of an accident a *substantially probable* result of which was death or

serious physical injury. *But see California Stevedore & Ballast Co. v. OSHRC*, 517 F. 2d at 988 n.1 (possibility of accident element satisfied by proof of specific standard, indicating legislative judgment that an accident is possible under conditions specified in this standard).

[3] Applying this standard to the evidence before the Board, we conclude that the Commissioner's case was fatally defective in that there was no evidence that the failure to shore or slope the sides of the trench created the possibility of an accident. While Officer Stephens testified that in his opinion the violation was serious, whether the violation was indeed serious is a question of law and not a matter for a witness' speculation. While the safety officer may give his opinion on the factual elements, he is incompetent to testify on the ultimate legal issue. There was substantial testimony that a probable result of a cave-in would be death or serious harm, but this testimony does not show that failure to shore or slope *this* trench, which was dug in soil of ninety-five to ninety-seven percent compaction, created the possibility of an accident. Indeed, there is evidence to the contrary. Mr. Leatherman, the foreman at the jobsite, testified that he thought that shoring or sloping was unnecessary in soil of such high compaction. Officer Stephens requested one of respondent's employees to get in the trench to measure it, the inference being that a safety inspector would not allow someone to get into an unsafe trench. All that is required of the Commissioner is that he produce substantial evidence, whether it be data or opinion, that the violation created a *possibility* of a serious accident. This he has failed to do, and the fine for a serious violation was improperly imposed. We find that the Board's decision is affected by error of law, G.S. § 150A-51(4), in that it incorrectly applied the term "serious violation" and that its findings and conclusion that respondent committed a "serious violation" is not supported by substantial evidence in view of the entire record as submitted, G.S. § 150A-51(5). Accordingly, the Board's conclusion that respondent committed a serious violation of 29 CFR § 1926.652(c) is reversed and the order imposing the penalty therefor is vacated.

We note, however, that the Commissioner has shown a nonserious violation for which a civil penalty of up to $1,000 *may* be imposed, G.S. § 95-138(a), and the case must be remanded to the

Board for its consideration of what, if any, penalty should be imposed for this violation.

Because we have decided that the Commissioner failed to show the possibility of an accident, we do not consider whether the evidence establishes that the respondent, in the exercise of reasonable diligence, could not have known of the violation.

## C.

### REPEATED VIOLATION

We next address the question whether the Court of Appeals erred in affirming the Board's decision that respondent was also guilty of committing a "repeated" violation. Whether respondent has "repeatedly" violated an OSHA standard is important because G.S. 95-138 provides that an employer who willfully or repeatedly violates the requirements of OSHANC may be assessed by the Commissioner a civil penalty of not more than $10,000 for each violation.

It is the opinion of this Court that the Court of Appeals erred in not finding that the Board committed an "error of law," G.S. 150A-51(4), in failing to interpret properly the statutory meaning of the word "repeated." Likewise, the Court of Appeals made no attempt to interpret the meaning of the term.

Unlike the word "serious," the term "repeated" is nowhere defined in our Occupational Safety and Health Act. As noted above, G.S. 95-138 provides simply that one who "repeatedly" violates any standards of the Act is subject to the maximum fine of $10,000, a penalty ten times larger than that permissible for a "serious" violation.

It is our task, therefore, to interpret the word "repeated" as it is employed in G.S. 95-138. Our primary task in interpreting the meaning of a statutory term is, of course, to ascertain and adhere to the intent of the Legislature. *In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978). The cardinal rule of statutory construction is that the intent of the Legislature is controlling. *State v. Fulcher*, 294 N.C. 503, 520, 243 S.E. 2d 338, 350 (1978).

[4] Respondent first argues that for a violation to be repeated it must be of the same substandard. Such an interpretation would mean that the 1977 violation of 29 CFR 1926.652(c) for failure to slope or shore a trench dug in compact soil could not be a "repeat-

ed" violation because the 1974 violations were of 29 CFR § 1926.652(b), failure to shore properly the sides of a trench dug in unstable soil, and 29 CFR § 1926.652(e), failure to add additional shoring when the trench is dug adjacent to a highway. We cannot accept this construction of repeated violation. Although the violations here involved are of different subsections, they are still of the same standard. The standard, 29 § CFR 1926.652, governs safety precautions for sewer line trenches. Although each subsection specifies the minimum precautions against cave-ins for trenches depending on soil condition, size and location, the standard is still the same: all trenches must be adequately supported either by shoring or sloping. What constitutes adequate safety precautions, of course, depends on the location and size of the trench and the condition of the soil.

We think the purpose behind the much greater fine for repeated violations is to punish an employer for failure to comply with a standard about which, because of prior violations, he should be cognizant. While the minimum requirements for trenches dug in hard soil are different from those dug in unstable soil, the basic requirement of adequate support remains the same, and a violation of one subsection should make an employer aware that minimum support standards exist. In order for a violation to be repeated, it must be against the same employer and it must also be *substantially similar* to prior violations. *See Bunge Corp. v. Secretary of Labor*, 638 F. 2d 831; *Todd Shipyards Corp. v. Secretary of Labor*, 586 F. 2d 683, 685-87 (9th Cir. 1978); *George Hyman Construction Co. v. OSHRC*, 582 F. 2d 834 (4th Cir. 1978); Potlatch Corp., 1979 OSHD Empl. Safety & Health Guide (CCH) ¶ 23,294. In this case, where the violations were of different subsections of the same standard and involved the same hazard, the subsequent violation is one which *may* form the basis of a citation for a repeated violation.

There remains the question of when the commission of a violation substantially similar to a prior violation is "repeated" within the meaning of G.S. 95-138(a) such that a fine may be imposed. Our research reveals that the authorities are divided on this issue.

This question was first addressed by the Third Circuit in *Bethlehem Steel Corp. v. OSHRC*, 540 F. 2d 157 (3d Cir. 1976). That court interpreted "repeatedly" as requiring a flaunting

disregard of the requirements of the safety standards and that "[t]he mere occurrence of a violation of a standard or regulation more than twice does not constitute that flaunting necessary to be found before a penalty can be assessed . . . ." *Id.* at 162. Under the Third Circuit's interpretation of "repeatedly," a second violation could never form the basis for a citation for a repeated violation. *Id.* at 162 n. 11.

The Third Circuit's interpretation of "repeatedly" has been strongly criticized in subsequent cases in other circuits. In *Todd Shipyards Corp. v. Secretary of Labor,* 566 F. 2d 1327 (9th Cir. 1977), the Ninth Circuit rejected the "flaunting" requirement saying, "We decline to adopt that view, which essentially equates 'wilful' with 'repeated' while failing to give appropriate weight to the disjunctive 'or.' " *Id.* at 1331. The *Todd* court did not address the general question of the meaning of "repeatedly" but indicated that when the two violations involved the same facility, similar hazards and similar conditions the subsequent violation was repeated. This view was reaffirmed in *Todd Shipyards Corp. v. Secretary of Labor,* 586 F. 2d at 685-87. Thus, the Ninth Circuit would uphold a "repeated" citation for a second substantially similar violation. The Fourth Circuit adopted the Ninth Circuit's interpretation and rejected the reasoning of the Third Circuit in *George Hyman Construction Co. v. OSHRC,* 582 F. 2d 834.

In *Potlatch Corp.,* 1979 OSHD Empl. Safety & Health Guide (CCH) ¶ 23,294, the federal OSHA Review Commission faced the issue of interpreting "repeatedly," and a majority of that body voted to reject the notion that "repeatedly" requires flaunting conduct. The Commission concluded that "[a] violation is repeated . . . if, at the time of the alleged repeated violation, there was a Commission final order against the same employer for a substantially similar violation." *Id.* at p. 28,171. In the Commission's opinion, the length of time between the substantially similar violations was irrelevant to the issue of whether the later violation was repeated, although in its opinion the lapse of time could be considered in determining the appropriate penalty. The *Potlatch* definition of "repeatedly" was adopted by the Fifth Circuit in *Bunge Corp. v. Secretary of Labor,* 638 F. 2d 831.

[5] The North Carolina Safety and Health Review Board addressed this issue in *Brooks v. Baker Cammack Hosiery Mills,* OSHANC No. 77-178 (Sept. 29, 1977). In *Baker Cammack Hosiery*

*Mills,* the Board concluded that a repeated violation occurs when "the circumstances of the subsequent violation of the same standard by the same employer are such as to lead to the conclusion that, at the time of the subsequent violation, the employer . . . should have known of the standard by virtue of his prior citation . . . . " Slip op. at 3. The factors the Board thought should be considered in determining whether the employer should have known of the standard were the extent to which the condition was obviously unsafe, the proximity in time to the prior citation, whether management or key employees had changed between citations, and the number of prior substantially similar violations. Under this interpretation a second violation could be a repeated violation.

We agree with the reasoning of our own Board. The great disparity between fines for repeated or willful violations and other violations indicates that our Legislature intended to impose the greater fine only when the employer has some degree of culpability. In our opinion, however, the culpability necessary to sustain a citation for a repeated violation does not rise to the level of flaunting conduct that the Third Circuit would require. We agree with the federal Review Commission, the Fourth Circuit and the Ninth Circuit that the imposition of the flaunting conduct requirement as an element for a repeated violation amounts to equating "repeatedly" with "willfully." We disagree with those decisions, however, to the extent they conclude that culpability is irrelevant in determining whether a violation is repeated. We hold that a subsequent violation by the same employer substantially similar to a prior violation or violations is a repeated violation only if the employer should have known of the standard by virtue of the prior citation or citations. We adopt the factors listed by the North Carolina Safety and Health Review Board as relevant to the determination of whether the violation was repeated.

[6] The second violation in this case took place approximately two and one-half years after the first. The basis of the 1974 violation was the inadequacy of the speed shoring used by respondent to support a trench dug in unstable soil adjacent to a highway. The conditions surrounding the 1977 violation present little similarity: the absence of sloping or shoring of a trench dug in hard, compact soil. Additionally, the persons in charge of the

work at the two jobsites were not the same. Although the potential hazards of the two violations, *i.e.*, cave-in, are the same, the conditions surrounding those violations are strikingly dissimilar. Additionally, there is ample evidence that the trench, dug in hard and stable soil, was not "obviously unsafe." The length of time between the two violations, the dissimilarity of conditions, the fact that the job supervisors were different, and that the failure to support the sides of this trench did not create an obvious danger, lead us to conclude that the Board's conclusion that the 1977 violation was repeated is unsupported by substantial evidence in view of the entire record as submitted. Accordingly, its decision that respondent has committed a repeated violation must be reversed pursuant to G.S. § 150A-51(5) and the corresponding penalty must be stricken.

### III.

This Court has been particularly lenient in agreeing to address the merits of the issues raised by this appeal. In addition to the failure of the parties and the lower courts to properly identify and apply the appropriate scope of judicial review under the APA, as discussed in Section IIA of this opinion, we must also note that respondent's brief flagrantly violates the North Carolina Rules of Appellate Procedure. Rule 28(b)(3) provides, in part, that "immediately following each question shall be a reference to the assignments of error and exceptions pertinent to the question, identified by their numbers and by the pages of the printed record on appeal at which they appear." Respondent's brief here contains no references to assignments of error and exceptions relating to the arguments presented. We remind counsel that the Rules of Appellate Procedure are mandatory and failure to comply invites dismissal of the appeal.

We also agree with the Court of Appeals' statement that "the decision section of the Board's 'decision' is inexpertly written. It contains discussions, arguments, contentions, evidence, and conclusions, all of which are intermixed and thrown together in somewhat random fashion." 49 N.C. App. at 356, 271 S.E. 2d at 571-72. The final order in a contested case of an administrative agency should be clearly and cogently written with appropriate findings of fact and conclusions of law preceding the statement of

decision. An administrative agency's final decision, always subject to review by the courts, is no place for a rambling, disjointed discourse.

In spite of the many deficiencies noted above in the manner by which this appeal has been presented to this Court, we have elected to address the merits in light of its importance to the agency and to industry. However, we will not necessarily be so lenient in the future; appeals presented in violation of the Rules of Appellate Procedure are subject to outright dismissal.

In conclusion, we reverse the Court of Appeals' holding affirming the conclusions of the Safety and Health Review Board that the 1977 violation was both "serious" and "repeated" and the $2,500 fine imposed therefor. On remand, the Board may, if it so chooses, impose an appropriate penalty for a non-serious violation in accordance with G.S. 95-138(a). The decision of the Court of Appeals is reversed and this cause is remanded to that court with instructions to remand to the Safety and Health Review Board for further proceedings not inconsistent with this opinion.

Reversed and remanded.