IN THE MATTER OF: SUZANNE ELIZABETH KRING CAFIERO, R.N. CERTIFICATE No. 97857, PETITIONER v. NORTH CAROLINA BOARD OF NURSING, RESPONDENT

No. 9010SC405

(Filed 7 May 1991)

1. **Physicians, Surgeons and Allied Professions § 6 (NCI3d) — nurse — negligence — license suspended**

   The superior court did not err in affirming the Board of Nursing's determination that petitioner violated N.C.G.S. § 90-171.37(4) in connecting a patient to a monitor in a way that resulted in an electrical shock to the patient. Petitioner's argument that the statute was not intended to apply to a single act of negligence overlooks the fact that a single act may have very serious consequences, and whether petitioner's conduct in the incident at issue is viewed as a single act or a series of acts, her conduct was within the meaning of the statute. The board had the authority to suspend her license even though the record shows that her nursing performance before and after the incident was exemplary.

   **Am Jur 2d, Physicians, Surgeons, and Other Healers § 101.**

   **Revocation of nurse's license to practice profession. 55 ALR3d 1141.**

2. **Physicians, Surgeons and Allied Professions § 6.2 (NCI3d) — nurse — negligence — license suspended — standard of care**

   The Board of Nursing, when considering the revocation of a nursing license, was not required under the particular facts of this case to establish a standard of care by expert testimony nor to apply a statewide standard of care because the dangers of live electrical cords are within the realm of common knowledge. The trial court's findings and conclusions are supported by substantial competent evidence.

   **Am Jur 2d, Physicians, Surgeons, and Other Healers § 101.**

   **Revocation of nurse's license to practice profession. 55 ALR3d 1141.**

IN RE CAFIERO v. N.C. BOARD OF NURSING

[102 N.C. App. 610 (1991)]

APPEAL by petitioner from Order entered 21 November 1989 by *Judge Donald W. Stephens* in WAKE County Superior Court. Heard in the Court of Appeals 27 November 1990.

*Yates, McLamb & Weyher by Dan J. McLamb, Barbara B. Weyher and Andrew A. Vanore, III, for petitioner appellant.*

*Howard A. Kramer for respondent appellee.*

*Attorney General Lacy H. Thornburg by Assistant Attorney General J. Charles Waldrup, for The University of North Carolina Hospitals at Chapel Hill, amicus curiae.*

COZORT, Judge.

Pursuant to N.C. Gen. Stat. § 150B-45 (1987), petitioner sought judicial review in Wake County Superior Court of a final agency decision of the North Carolina Board of Nursing (the Board) suspending her license as a registered nurse. The superior court affirmed in part the Board's decision, and petitioner appealed. We affirm.

The case below arose out of an incident that occurred in the course of petitioner Suzanne Cafiero's nursing care of an infant. On 5 October 1987, the parents of two-month-old Jamie Lynn Moss brought her to North Carolina Memorial Hospital for diagnostic tests related to "GER and apnea." At the Gastrointestinal Clinic a pH probe was inserted into Jamie Moss's stomach; she was then checked into a room and assigned as a patient to Ms. Cafiero. As a matter of hospital procedure, infants of Jamie's age were connected to cardiorespiratory monitors. Ms. Cafiero's conduct in connecting Moss to a monitor resulted in an electrical shock to Jamie, which led to disciplinary action against her and subsequently to an administrative hearing pursuant to N.C. Gen. Stat. §§ 150B-38 through -42 (1987 & Cum. Supp. 1990).

As petitioner Cafiero conceded at the hearing before the Board, she "was unfamiliar with" and had never used "the older model of the Hewlett-Packard monitor" which she connected to Jamie Moss. Testimony before the Board differed as to whether the petitioner was instructed by charge nurse Gretchen Baughman to wait for her assistance before attaching the monitor. Baughman testified as follows:

Q Did [Cafiero] indicate to you that she did not know how to set it up on her own?

A She wanted help. We were going to—we were going to work on it together.

Ms. Cafiero testified:

I went to the closet, and there was a monitor there, this particular monitor. . . . I did not recognize it as one that I had worked with. And I went to Gretchen Baughman, who was busy with a patient, and told her that there was a monitor there but it was one that I was unfamiliar with. And she told me that I should take—take the monitor and set it up and that it was like all of the others that we have used on the floor and she felt confident that I would be able to—to hook her up to it.

Accounts of the accidental electrical shock of Jamie Moss differed in a number of details. Joanie Moss, mother of the infant, testified as follows:

I walked to the door of the room. [Nurse Cafiero] called me back, asked me to stand by the crib so she wouldn't have to put the side up while she set the—the neonatal monitor. I was standing over Jamie. There was a click. Jamie immediately went up in a ball in the fetal position. She was trembling. Her eyes were real big. She was a red color. . . . I screamed. I told her to turn the monitor off because it was shocking her. Nurse Cafiero said, no, it's not. She's okay. She's okay. I continued to scream. I saw the—a black cord on the bed—on the crib beside Jamie that her three lead wires were attached to. I unplugged her three lead wires from the black cord. Jamie fell back on the bed with her head turned to the right side. Her eyes were closed. Her mouth was open. She had a blue tint. I then ran out of the room yelling for help, asking for a doctor.

Q Take your time.

A Okay, when I came back into the room, there was a nurse, who I later found out was the charge nurse, resuscitating Jamie. I left the room again. When I came back, there were doctors, nurses around her, and they were resuscitating her. I couldn't really see Jamie, and then I was ushered out of the room.

IN RE CAFIERO v. N.C. BOARD OF NURSING

[102 N.C. App. 610 (1991)]

Petitioner Cafiero testified as follows:

I plugged this into the outlet. And I heard the mother scream-
ing, the baby is being shocked. I turned around to see what
was going on. As I got about halfway from this extension,
I looked and I just reached down. I did not go back to the
outlet. And I pulled this out to see what was going on because
the mother seemed to be screaming.

[Q] And at the same time, did the mother pull the cable
from the—

A I was not aware—

Q —power cord that you—

A I was not aware of that. I went immediately to the
baby's bedside.

*  *  *  *

Q And what happened after that?

A The mother ran out into the hallway, and she started
screaming that I had shocked her baby. And I was standing
at the bedside trying to assess the patient's condition. Jamie
was slightly floppy. I don't recall her being arching. I do not
recall any arching at all. If anything, she was a little floppy.
And I was looking—I was checking her breathing. I was check-
ing her pulse. And Gretchen came immediately into the room
and kind of pushed me aside and looked. And she started
to get cyanotic around her mouth, and Gretchen started to
do mouth-to-mouth resuscitation.

Julie Phipps, clinical nurse coordinator for pediatrics and
neonatal nursing, testified that she heard

someone scream, she shocked my baby. And I went to see
what was happening.

Q Did you go into the room?

A Yes, I did. I looked immediately to see what was going
on. And there was a monitor beside the bed that was un-
plugged from the wall. . . .

IN RE CAFIERO v. N.C. BOARD OF NURSING

[102 N.C. App. 610 (1991)]

Q Did you observe whether the monitor was, in addition to being unplugged at the wall when you entered the room, whether the leads to the patient cable were also unplugged?

A Yes, they were, because after I went back in the room, I got the monitor out and—so that we could call med. engineering.

After hearing testimony from three other staff members of North Carolina Memorial Hospital and considering a number of exhibits, the Board made the following pertinent findings of fact and conclusions of law:

[FINDINGS]

(6) Ms. Cafiero put the leads on Jami's [sic] chest, and inserted the end of the leads into a cord attached to the back of the monitor. Ms. Cafiero then plugged the machine into the wall. A click was heard, and Jami [sic] was noted to be balled up in a fetal position, trembling, with a red color, and "looked hard." Mrs. Moss screamed and told Ms. Cafiero to turn the monitor off, that she was shocking her baby. Ms. Cafiero told her everything would be o.k. in a minute. Mrs. Moss then saw a black cord on the bed next to Jami [sic] and she unplugged the leads from this black cord. Jami [sic] then fell back on the bed. Ms. Moss went into the hall calling for assistance from a physician.

Gretchen Baughman, RN, Charge Nurse on this shift, came to the room and initiated cardio-pulmonary resuscitation. Jami [sic] was successfully resuscitated, and transferred to the Pediatric Intensive Care Unit (PICU). She did sustain two burns on her chest and one burn on her stomach from this incident. Jamie's parents were later told by the Risk Manager that Jami [sic] was electrocuted by the Neonatal Monitor;

(7) an investigation into this incident was initiated by the Hospital. The monitor had been immediately removed from the patient's room by Julie Phipps, Clinical Nurse Coordinator for Pediatrics and Neonatal Nursing, and a medical engineer was called to check the monitor. Ms. Phipps said she initially thought the machine had malfunctioned.

IN RE CAFIERO v. N.C. BOARD OF NURSING

[102 N.C. App. 610 (1991)]

Ms. Cafiero explained to the engineer exactly how she hooked up the monitor. It was determined she placed the patient leads directly into an electrical cord and not a patient cable, resulting in an electrical shock being delivered to the patient.

\* \* \* \*

Ms. Cafiero approached Ms. Baughman, her Charge Nurse, and asked her for assistance in hooking up the monitor. Ms. Baughman told Ms. Cafiero she was busy at the moment, but that she (Ms. Baughman) would come down and help her (Ms. Cafiero) set up the monitor.

Ms. Baughman was not aware Ms. Cafiero had attempted to set up the monitor unassisted, until she entered Jami's [sic] room following the mother's scream. Ms. Baughman stated she thought that she and Ms. Cafiero were going to set the monitor up together.

The Hospital's investigation showed Ms. Cafiero requested direction from another nurse, but did not wait for the nurse to assist her with the procedure. . . .

\* \* \* \*

[CONCLUSIONS]

\* \* \* \*

(5) the licensee has violated G.S. 90-171.37(4) in that she engaged in conduct that endangered the public health, as evidenced by the fact she had inadequate knowledge and skills to use a particular monitor, she recognized she did not know how to use this particular monitor and she proceeded to hook up the monitor without waiting for assistance, which resulted in a patient injury; and,

(6) the licensee has violated G.S. 90-171.37(5) in that she is incompetent to practice nursing by reason of a deliberate and negligent act as evidenced by the fact she had inadequate knowledge and skills to use a particular monitor, she recognized she did not know how to use this particular monitor and she proceeded to hook up the monitor without waiting for assistance, which resulted in a patient injury.

The Board then ordered that Ms. Cafiero's license to practice as a registered nurse be suspended for thirty days and assessed costs

of the disciplinary action against her. Ms. Cafiero petitioned the superior court for review of the Board's Order of 9 December 1988.

On 21 November 1989, having reviewed the record submitted to it, the superior court concluded

(4) That the findings of fact of the Nursing Board were based upon substantial competent evidence contained in the whole record and consistent with a reasonable and proper interpretation of that evidence;

* * * *

(6) That the Nursing Board's conclusions of law were proper and supported by the findings of fact, except as to Board Conclusion of Law #6; the evidence of record overwhelmingly shows that Petitioner engaged in a single act of negligence that seriously endangered the life and health of a patient in violation of G.S. 90-171.37(4); however, the Court rules as a matter of law that such single act of negligence is insufficient, standing alone, to constitute "incompetence to practice nursing" under G.S. 90-171.37(5) and therefore this conclusion of law by the Nursing Board upon the evidence of record is erroneous and is reversed;

(7) That the disciplinary action taken by the Nursing Board in suspending Petitioner's nursing license for 30 days and in assessing costs is clearly supported by the Board's findings of fact and the proper conclusion of law found by the Board that Petitioner had "engaged in conduct that endangered the public health"; and

(8) That Petitioner was not prejudiced by the Nursing Board's error in concluding that she was also in violation of G.S. 90-171.37(5); the disciplinary action taken by the Board clearly shows that Petitioner was disciplined for a single negligent act that endangered a patient's health and not for any other conduct and therefore the Board's erroneous Conclusion of Law #6 did not in any way affect the sanction imposed by the Board in this case.

The Superior Court granted Ms. Cafiero's application for a stay of its order, and she appealed that order to this Court.

We note initially that North Carolina follows the "rule that it is for the administrative body, in an adjudicatory proceeding,

to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence." *State ex rel. Com'r of Ins. v. N.C. Rate Bureau*, 300 N.C. 381, 406, 269 S.E.2d 547, 565 (1980). We note further that N.C. Gen. Stat. § 150B-51(b) (1987) provides that

> the court reviewing a final decision may affirm the decision of the agency or remand the case for further proceedings. It may also reverse or modify the agency's decision if the substantial rights of the petitioners may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
>
> (6) Arbitrary or capricious.

Appeal from the decision of the court which, pursuant to § 150B-51, has initially reviewed a final agency decision, is provided by N.C. Gen. Stat. § 150B-52 (1987) and "the scope of review to be applied by the appellate court under Section 150B-52 of the APA is the same as it is for other civil cases." *Henderson v. Dep't of Human Resources*, 91 N.C. App. 527, 531, 372 S.E.2d 887, 890 (1988).

The standard of review known as the "whole record" test "does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo." Thompson v. Wake County Board of Education*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977). Where, however, the "issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely substitute its judgment for that of the agency and employ *de novo* review." *In re Appeal of North Carolina Savings & Loan League*, 302 N.C. 458,

466, 276 S.E.2d 404, 410 (1981), *accord Brooks v. McWhirter Grading Co.*, 303 N.C. 573, 581-82, 281 S.E.2d 24, 29-30 (1981). With these principles in mind, we turn to the merits of petitioner's appeal.

[1]   We address first the petitioner's second assignment of error pursuant to which she contends that the trial court erred in affirming the Board's conclusion that she violated G.S. 90-171.37(4). At the time of the incident from which the case below arose, § 90-171.37 of the Nursing Practice Act read in pertinent part as follows:

> In accordance with the provisions of Chapter 150B of the General Statutes, the Board may require remedial education, issue a letter of reprimand, restrict, revoke, or *suspend any license to practice nursing* in North Carolina or deny any application for licensure if the Board determines that the nurse or applicant:
>
> (1) Has given false information or has withheld material information from the Board in procuring or attempting to procure a license to practice nursing;
>
> (2) Has been convicted of or pleaded guilty or nolo contendere to any crime which indicates that the nurse is unfit or incompetent to practice nursing or that the nurse has deceived or defrauded the public;
>
> (3) Has a mental or physical disability or uses any drug to a degree that interferes with his or her fitness to practice nursing;
>
> (4) Engages in conduct that endangers the public health;
>
> (5) Is unfit or incompetent to practice nursing by reason of deliberate or negligent acts or omissions regardless of whether actual injury to the patient is established;
>
> (6) Engages in conduct that deceives, defrauds, or harms the public in the course of professional activities or services; or
>
> (7) Has willfully violated any provision of this Article or of regulations enacted by the Board.
>
> The Board may take any of the actions specified above in this section when a registered nurse approved to perform medical acts has violated rules governing the performance of medical acts by a registered nurse; provided this shall not

**IN RE CAFIERO v. N.C. BOARD OF NURSING**

[102 N.C. App. 610 (1991)]

interfere with the authority of the Board of Medical Examiners to enforce rules and regulations governing the performance of medical acts by a registered nurse. (Emphasis added.)

The petitioner maintains that under § 90-171.37 "discipline is warranted for past actions *only* when they involve wilfullness or criminal conduct." (Emphasis in original.) From the General Assembly's use of the present tense in subsections (4) and (6), the petitioner infers that "sanctions are permissible for a violation *only* if the violation is continuing at the time of the hearing." (Emphasis in original). We disagree.

In 1981 the Nurse Practice Act was renamed the Nursing Practice Act, extensively rewritten, and recodified. 1981 N.C. Sess. Laws ch. 360, § 1. The Nursing Practice Act (the Act) includes § 90-171.37 (formerly § 90-163). The language of the second paragraph of that section was amended slightly in 1981, and, except for recodification and a technical amendment related to recodification, the section has not been altered since. 1981 N.C. Sess. Laws ch. 360, § 1; ch. 852, § 3; 1987 N.C. Sess. Laws ch. 827, § 1.

Petitioner cites no case construing § 90-171.37, and we are aware of none. The primary rule of statutory construction is that the intent of the Legislature controls. *In re Hardy*, 294 N.C. 90, 95, 240 S.E.2d 367, 371 (1978). Among other indicia of intent, courts look to the context and purpose of the statute taken as a whole. *In re Banks*, 295 N.C. 236, 239, 244 S.E.2d 386, 389 (1978). Words and phrases "must be construed as a part of the composite whole and must be accorded only that meaning which other modifying provisions and the clear intent and purpose of the act will permit." *Watson Industries v. Shaw, Comr. of Revenue*, 235 N.C. 203, 210, 69 S.E.2d 505, 511 (1952).

When the Legislature ratified Article 9A of Chapter 90 (the Nursing Practice Act), it found "that mandatory licensure of all who engage in the practice of nursing is necessary to ensure minimum standards of competency and *to provide the public safe nursing care*." N.C. Gen. Stat. § 90-171.19 (1990) (emphasis added). To this end the Board of Nursing was empowered, *inter alia*, to

(1) Administer this Article;

(2) Issue its interpretations of this Article;

(3) Adopt, amend or repeal rules and regulations as may be necessary to carry out the provisions of this Article;

\* \* \* \*

(7) Cause the prosecution of all persons violating this Article; . . .

N.C. Gen. Stat. § 90-171.23(b)(1)(2)(3)(7) (1990). The Board was also empowered to revoke, suspend, or deny licensure as provided in § 90-171.37 (quoted above).

In view of the regulatory and disciplinary as well as licensing functions of the Board, we hold that the superior court did not err in affirming the Board's determination that petitioner violated § 90-171.37(4). Petitioner's argument that § 90-171.37(4) was not intended to apply to a single act of negligence overlooks the fact that a single act may have very serious consequences. A single act may endanger health or even life. Negligently delivering an electrical shock to a patient is such an act. Petitioner's inference from the use of the present tense in § 90-171.37(4) that a sanction is permissible "only if the violation is continuing at the time of the hearing" would lead to absurd results. Applied to the facts of the case below that interpretation would prohibit the Board from acting unless a nurse caused a series of accidents, regardless of their severity, which continued to the eve of the Board's hearing. Indeed the petitioner's reliance on the use of the present tense in § 90-171.37(4) would dictate that the conduct at issue be coterminous with the hearing itself. That construction is untenable. The "language of a statute will be interpreted so as to avoid an absurd consequence." *Hobbs v. Moore County*, 267 N.C. 665, 671, 149 S.E.2d 1, 5 (1966).

Petitioner maintains that the Board misinterpreted § 90-171.37(4) not only with regard to "engages" but also with regard to "conduct." She contends that "one isolated act" cannot meet the definition of conduct. We disagree.

Conduct may include "any positive or negative act." Black's Law Dictionary 268 (5th ed. 1979). Whether the petitioner's conduct in the incident at issue is viewed as a single act or a series of acts, for example, failing to follow Nurse Baughman's instructions to wait for assistance and incorrectly connecting the monitor, we hold that her "conduct" was within the meaning of that word as intended by the statute. Accordingly, the Board had the authority

to suspend her license even though the record shows her nursing performance, both before and after the incident at issue, has been exemplary.

[2] We turn next to the petitioner's first assignment of error: the "trial court's Findings and Conclusions . . . were not supported by substantial competent evidence contained in the whole record." Observing that the Board had before it no "evidence of a uniform statewide standard [of care] against which to measure . . . [a] licensee's actions," the petitioner contends that the Board lacked substantial evidence upon which to base sanctions. The petitioner contends further that such a standard could only be established by expert testimony. We disagree.

Under the particular facts presented by the case below the Board was not required to establish a standard of care by expert testimony nor to apply a statewide standard of care to the petitioner's actions. Where the "evidence of lack of ordinary care is patent and such as to be within the comprehension of laymen, requiring only common knowledge and experience to understand and judge it, expert testimony is not required." *Wilson v. Hospital*, 232 N.C. 362, 366, 61 S.E.2d 102, 105 (1950). The dangers of live electrical cords are within the realm of common knowledge. The record contains ample evidence that the petitioner did not exercise ordinary care in connecting Jamie Moss to the monitor she obtained from the storage closet. Having examined the whole record, we find that the trial court's findings and conclusions are supported by substantial competent evidence.

Turning to the petitioner's remaining assignment of error, we note that it is not presented nor discussed in her brief. Accordingly, it is deemed abandoned. N.C.R. App. P. 28.

The trial court's order of 21 November 1989 is

Affirmed.

Judges WELLS and JOHNSON concur.